[939 NYS2d 307]

UNITED STATES FIDELITY & GUARANTY COMPANY et al., Respondents, v AMERICAN RE-INSURANCE COMPANY et al., Appellants, et al., Defendants.

First Department, January 24, 2012

### APPEARANCES OF COUNSEL

*Wachtell, Lipton, Rosen & Katz*, New York City (*Herbert M. Wachtell* and *Ben M. Germana* of counsel), for American Re-Insurance Company, appellant.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Kathleen M. Sullivan, Michael B. Carlinsky, Jane M. Byrne* and *Sanford I. Weisburst* of counsel), for Excess Casualty Reinsurance Association and OneBeacon America Insurance Company, appellants.

*Boies, Schiller & Flexner, LLP*, Albany (*George F. Carpinello* and *Benjamin I. Battles* of counsel), for ACE Property & Casualty Company and Century Indemnity Company, appellants.

*Simpson Thacher & Bartlett LLP*, New York City (*Mary Kay Vyskocil, Chet A. Kronenberg* and *Seth A. Ribner* of counsel), for respondents.

*Freeborn & Peters LLP*, Chicago, Illinois (*Kerry E. Slade, Joseph T. McCullogh IV* and *Robin E. Dusek* of counsel), for Reinsurance Association of America, amicus curiae.

*Chaffetz Lindsey LLP*, New York City (*Peter R. Chaffetz* and *Andreas A. Frischknecht* of counsel), for Complex Insurance Claims Litigation Association and Chartis Inc., amici curiae.

## OPINION OF THE COURT

Acosta, J.

This case presents us with a reinsurance coverage dispute arising out of asbestos litigation which has spanned several decades and involved the state and federal courts of several jurisdictions.[1] For the sake of brevity, we presume familiarity with the case, and provide a general overview of the facts directly relevant to this appeal.

The Underlying Asbestos Claims

In the 1950s and 1960s, Western Asbestos was a company that sold, distributed and installed asbestos-containing products. In 1967, Western Asbestos dissolved. Its business was taken over by Western MacArthur Company (MacArthur). Beginning in the 1970s, individuals with asbestos-related health injuries began suing MacArthur based on their exposure to Western Asbestos related products. In 1993, MacArthur sued plaintiff herein, United States Fidelity & Guaranty Co. (USF&G), and another insurance company in California state court seeking coverage under policies allegedly issued to Western Asbestos. USF&G initially declined coverage. USF&G argued several defenses to the action, including that it had insured Western Asbestos, not MacArthur; that MacArthur was not a successor in interest to the policies; that it could not locate the policies; that even if it had the policies, the policies did not provide products liability coverage; and that even if the policies did provide liability coverage the claims would have exceeded the policies' aggregate limits. Significantly, in 1997, the California Court of Appeal held that MacArthur was not entitled to coverage under Western Asbestos's insurance policies (*General Acc. Ins. Co. v Superior Ct.*, 55 Cal App 4th at 1445, 1451 [In holding for the insurance companies, including USF&G, the court commented, "It is one thing to deem the successor corporation liable for the predecessor's torts; it is quite another to deem the successor corporation a party to insurance contracts it never signed, and for which it never paid a premium, and to deem the insurer to be in a contractual relationship with a stranger"]).

MacArthur countered the California appellate decision by resurrecting the then-defunct Western Asbestos in 1997 for the

---

1. *See e.g. General Acc. Ins. Co. v Superior Ct.*, 55 Cal App 4th 1444, 1445 (1997), *review denied* 1997 Cal LEXIS 6025 (1997); *Kaminski v Western MacArthur Co.*, 175 Cal App 3d 445, 451 (1985); and this Court's prior decision in *American Re-Ins. Co. v United States Fid. & Guar. Co.*, 40 AD3d 486 (2007).

purpose of assigning its insurance rights to MacArthur. MacArthur had a former Western Asbestos officer sign an assignment of insurance rights to MacArthur, and then successfully persuaded a California court to "revive" Western Asbestos to ratify the assignment. Western Asbestos intervened in the MacArthur action as a coplaintiff. The action proceeded to trial in 2002. USF&G argued that the assignment and ratification were unenforceable. The court rejected the claim.

USF&G ultimately settled the insurance coverage action with MacArthur in 2002. USF&G and the other insurers agreed to pay approximately $975 million in satisfaction of all asbestos injury-related claims. Pursuant to the settlement agreement, MacArthur was required to file for bankruptcy protection. As part of the bankruptcy proceeding, MacArthur was to seek, pursuant to 11 USC § 524 (g), an injunction to supplement the injunctive effect of the bankruptcy discharge. Essentially, in exchange for the creation of a trust fund by USF&G and the other insurers, which was to receive the $975 million payment for the compensation of existing and future asbestos claimants, MacArthur was to seek an injunction that would bar future claims against the insurance companies. Prior to the issuance of the injunction, the bankruptcy court was required to find that MacArthur had contributed something of value to the trust (11 USC § 524 [g] [4] [B] [ii]).

The bankruptcy petition was filed in and approved by the United States Bankruptcy Court for the Northern District of California. In its lengthy decision and order confirming the reorganization plan of MacArthur, including the settlement of the asbestos-injury claims and the creation of the trust, the court found first that the value of MacArthur itself was insufficient to support creation of the trust. The bankruptcy court did find, though, that MacArthur was contributing value to the trust in the form of its business loss claims. These "business loss claims" included "potential bad faith claims" against USF&G for its longstanding refusal to either indemnify, defend, or settle or otherwise pay the asbestos-injury claims. The court noted that while the bad faith claims were of "sufficient value" to justify the issuance of the injunctions, it was not deciding the merits or the specific value of the bad faith claims despite what it termed the "substantial evidence" to support them. Rather, the bankruptcy court merely stated that "some portion" of the $2 billion being contributed to the trust must be attributed to those bad faith claims, and that the value of the bad faith claims was at least in excess of MacArthur's $17 million net liquidation value.

The Reinsurance Treaties

Beginning in 1945, USF&G entered into a series of reinsurance treaties with defendants American Re-Insurance (American Re) and the Excess Casualty Reinsurance Association (ECRA), each of which provided 50% of the coverage under the terms of the reinsurance treaties. ECRA was a pool of reinsurers, each of which was responsible for a portion of ECRA's 50% of the treaty. The pool members were ACE Property & Casualty Company, Century Indemnity Company, OneBeacon America Insurance Company, and American Re.[2]

The treaty is an excess-of-loss contract, which requires the reinsurers to reimburse a portion of each covered loss over and above the amount of loss to be retained by USF&G (the retention). The first treaty, covering the period from 1945 to 1951, required USF&G to retain, for its own account, the first $50,000 arising from each covered loss. For the treaties running from 1951 to 1956 and 1956 to 1962, USF&G's retention increased to $100,000. For the treaties covering the years 1962 to 1975, USF&G's retention increased to $500,000, and for the treaties covering the years 1975 to 1980, USF&G's retention was $1,000,000. For the reinsurance treaty years 1956 to 1962, in dispute here, the maximum amount of loss payable by the reinsurers, after the $100,000 retention, was $4,900,000 for any one loss, subject to a limit of $3,000,000 for personal injury liability or property damage liability.

Following the settlement, in or about November 2002, USF&G submitted its reinsurance billing under the treaties for the reinsurer's share of the loss. In the settlement, the parties stipulated that USF&G issued 13 comprehensive general liability policies to Western Asbestos, the first of which incepted in 1948 and the last of which incepted on July 1, 1959. Following the execution of the settlement agreement, USF&G, in consultation with MacArthur and claimant's counsel, determined to allocate the losses to the policy covering the period July 1, 1959 through July 1, 1960. The 1959 policy year was one of the policy years with the highest per person limits of $200,000, allowing a higher payout to injured claimants. In addition, USF&G determined that the 1959 policy was the only policy year that covered all potential claims for anyone exposed to asbestos during the settlement period. In accordance with its

---

2. In addition to providing 50% of the reinsurance coverage, American Re was an 8% participant in the pool coverage.

decision to allocate all the settlement claims to the 1959 insurance contract year, USF&G allocated all of its reinsurance claims to 1959 as well.

USF&G states that in preparing the reinsurance cession, it treated each injury as a separate accident, applying the $100,000 retention to each claimant's injury. For past claims, the judgment amount attributable to USF&G was capped at the $200,000 policy limit, and only the portion exceeding the retention was ceded to the reinsurers. For future claims, only two types of asbestos injuries were valued above the $100,000 retention: lung cancer, valued at $200,000, and mesothelioma, valued at $500,000. USF&G's overall liability was calculated by multiplying the expected number of claimants in each category by $200,000. Half of that amount was then ceded to the reinsurers.

American Re and ECRA, however, refused to pay USF&G's reinsurance claim because, among other reasons, they believed that the retention under the 1956 to 1962 treaty had been increased from $100,000 to $3 million, and, that, notwithstanding the terms of the underlying settlement agreement as approved by the bankruptcy court, it was clear that USF&G was paying for MacArthur's bad faith claims against it, which were not covered under the treaty. In or about December 2002, American Re commenced this lawsuit as a declaratory judgment action, but the parties were realigned to make USF&G the plaintiff. The parties subsequently submitted motions for summary judgment. The IAS court granted USF&G's motion, and denied the reinsurers' (2010 NY Slip Op 32441[U] [2010]).

Defendants now appeal, arguing primarily that the "bad faith" of USF&G that they contend suffuses every layer of this action, from USF&G's initial denial of its duty to indemnify and defend MacArthur through its reinsurance presentation to the defendants, warrants summary judgment in their favor. Defendants believe that USF&G's bad faith has been so extensive that it has breached its duty of utmost good faith to them as the reinsurers.[3]

These dramatic contentions, however, can be distilled into basic questions of law and fact that defendants believe the motion

---

**3.** Despite these allegations of rampant bad faith, the record demonstrates that the reinsurers were kept duly advised of the course of the underlying litigation and settlement negotiations. The reinsurers manifestly had the right, under the treaty, to associate in the defense of the claim, but chose not to do so.

court erred in resolving. The question of fact, framed mainly by ECRA, concerns the increase of the retention in the 1956-1962 treaty to $3 million, an increase ECRA maintains was agreed upon by all parties. ECRA contends that even if the reinsureds did not agree to the increase in retention, sufficient conflicting evidence exists barring summary resolution of the issue. The issue of law, zealously pursued by both parties, concerns what they believe was the IAS court's erroneous application of the "follow the fortunes" doctrine, peculiar to reinsurance law. For the reasons set forth herein, we find defendants' arguments unavailing, and now affirm.

The Retention Amount

ECRA contends that in 1981, USF&G agreed to increase the retention amount on all of its reinsurance treaties from 1945 forward, to $3 million for claims reported on or after July 1, 1981. In support of this contention, ECRA asserts that its underwriter, Tom Renko, was concerned because claims from past years were "coming out of the woodwork," creating "rapidly ballooning exposures" that were hard to estimate. Renko, to address these concerns, contacted USF&G's broker and agent, James Steen of Guy Carpenter & Co., to negotiate the increase. ECRA points to numerous pieces of evidence in the record, including a memorandum of a conversation between Renko and Steen where the retention increase allegedly had been agreed to, a letter from Joseph K. Conwell, USF&G's Superintendent of Reinsurance, to Steen, acknowledging that the "old" casualty first layer would increase to a $3,000,000 retention for new claims after July 1, 1981, and a letter from Guy Carpenter & Co. to USF&G in 1987 stating that "it is clear that the original intent of the agreement between the reinsurers and USF&G was to 'clearly eliminate' " any further losses to the "old First Excess of Loss reinsurance layer, irrespective of the effective date of such covers." ECRA also points to the course of conduct of the parties following the alleged 1981 retention increase, where it claims USF&G, in unrelated claims to the one herein, acknowledged that the retention was over $3 million for all claims, including ones that occurred before 1962.

Despite this evidence pointed to by ECRA, we find that the motion court correctly concluded that the retention increase to $3 million was limited to those claims submitted under the 1962 to 1967 treaty and later treaty years. To be sure, USF&G points to other evidence claiming that it had only agreed to increase the retention to $3 million for claims post-1962, includ-

ing that only the reinsurance treaties going back to 1962 were endorsed to reflect the change in retention and a 1992 letter from Guy Carpenter to Renko stating that the agreement negotiated in 1981-1982 was that "all new claims against USF&G's 'old first layer' casualty cover (in force from 1/1/62 to 6/30/80) will be subject to a $3,000,000 retention."

However, the motion court found the affidavit submitted by the aforementioned Joseph Conwell of USF&G dispositive of this issue, and we agree. Conwell stated first that the "old First Excess" treaties mentioned in the correspondence cited by ECRA were for the treaty years starting in 1962, because 1962 was the first year in which USF&G's first and second layers of reinsurance were covered in separate treaties. Furthermore, Conwell states that when the retention for the 1962 policies was increased, the reinsurers were not suffering losses in the pre-1962 years, so no modification of those treaties was required. Finally, and most persuasively, the coverage limit for personal injuries under the 1956-1962 treaty was $3,000,000. Conwell stated that to increase the retention limit to $3,000,000 would effectively wipe out USF&G's reinsurance, as it would be forced to retain the reinsurance limit of its personal liability coverage. ECRA, in all of its arguments on appeal, fails to squarely address this affidavit, or to demonstrate an issue of fact showing how or why USF&G was prepared to basically forfeit its reinsurance for the 1956-1962 treaty years.

The Follow The Fortunes Doctrine

The reinsurance treaty here contains a follow the fortunes clause, which states:

> "All claims in which this reinsurance is involved, when allowed by the Company (USF&G), shall be binding upon the Reinsurers, which shall be bound to pay or allow, as the case may be, their proportion of such loss. It is understood, however, that when so requested, the Company will afford the reinsurers an opportunity to be associated with the Company, at the expense of the Reinsurers, in the defense of any claim or suit or proceeding involving this reinsurance, and the Company and the Reinsurers shall cooperate in every respect in the defense or control of such claim or suit or proceeding, provided that the Company (USF&G) shall have the right to defend, settle, or compromise any such claim, suit or proceeding, and such action on the part of the Company shall be binding upon its reinsurers."

The requirement that a reinsurer "follow the fortunes" of the reinsured is as old as the business of reinsurance itself. The doctrine is broad in its application, and is said to derive from the Latin phrase: *"[i]ste secundus assecurator tenetur . . . ad solvendum omne totum, quod primus assecurator solverit,"* which although "indeterminate and general in its expressions" (*New York State Mar. Ins. Co. v Protection Ins. Co.,* 18 F Cas 160, 161 [D Mass 1841, No. 10,216]) has been translated to mean that "the reinsurer is held in full to the result that the primary insurer [reinsured] obtained" (*North Riv. Ins. Co. v CIGNA Reins. Co.,* 52 F3d 1194, 1205 n 16 [3d Cir 1995]). Put simply, the reinsurer agrees to follow the insurer's financial obligations (fortunes), wherever they lead either company.

In modern parlance, follow the fortunes "burdens the reinsurer with those risks which the direct insurer bears under the direct insurer's policy covering the original insured" (*Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.,* 903 F2d 910, 912 [2d Cir 1990]), in effect protecting the "risk transfer mechanism by providing that covered losses pass uninterrupted along the risk transfer chain" (*North River Ins. Co.,* 52 F3d at 1205). It "simply requires payment where the [insurer's] good faith payment is at least arguably within the scope of the insurance coverage that was reinsured" (*Mentor Ins. Co [U.K.] Ltd. v Brannkasse,* 996 F2d 506, 517 [2d Cir 1993]), preventing the reinsurer from second guessing the good faith liability determinations made by its reinsured (*see e.g. Insurance Co. v Associated Manufacturers' Corp.,* 70 App Div 69 [1902], *affd* 174 NY 541 [1903]) as well as precluding "wasteful relitigation" by a reinsurer in cases where the insured has paid in good faith (*National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.,* 441 F Supp 2d 646, 650 [SD NY 2006]).

■ We find that the motion court correctly determined that the follow-the-fortunes doctrine required defendants to accept the reinsurance presentation made by USF&G herein. Accordingly, all of defendants' efforts to second guess USF&G's decisions concerning allocation of the loss, whether it be the alleged bad faith claims; the decision to allocate the losses to the 1959 USF&G/MacArthur policy year and corresponding failure to spread the losses over the 13 policy years; the valuation of the lung cancer and mesothelioma claims; the alleged alteration of the loss presentation from an accident to occurrence basis; and the failure of USF&G to otherwise spread the loss out over the life of the policies as purportedly required by California law,

which governed the USF&G/MacArthur policies, are precluded from this court's review (*see e.g. id.* at 650-651). However, even if we were to consider these arguments on the merits, we would disagree that they excused the reinsurers from their obligation to follow the fortunes of USF&G or created an issue of fact barring summary resolution.

As a basis for precluding summary judgment, the dissent points to MacArthur's claim in its coverage action that USF&G initially disclaimed coverage in bad faith, and discerns evidence in the record to support that claim. However, MacArthur's prior bad faith claim has no bearing on the reinsurers' obligations because the settlement agreement that resolved the coverage action does not allocate any of the settlement funds to compensating MacArthur for USF&G's alleged bad faith. The parties that negotiated the settlement, including MacArthur and its affiliates, the asbestos plaintiffs, and USF&G, confirm that the settlement amount was solely allocated to establish and administer the trust fund to compensate asbestos claimants and reimburse MacArthur's litigation fees and costs.

Defendants nonetheless argue that, because of a statement by the bankruptcy court in its decision confirming MacArthur's reorganization plan, the doctrine of collateral estoppel requires us to find that some of the settlement amount is attributable to bad faith claims. We disagree. Preclusion only applies to an issue that was "actually litigated, squarely addressed and specifically decided" (*Ross v Medical Liab. Mut. Ins. Co.*, 75 NY2d 825, 826 [1990]). Here, the parties to the bankruptcy proceeding never litigated whether USF&G paid monies to MacArthur on account of bad faith. The issue only arose tangentially when the bankruptcy court addressed whether the reorganization plan was "proposed in good faith," as required pursuant to 11 USC § 1129 (a) (3). Specifically, the court was considering the objection by some parties that the plan had not been proposed in good faith because the amount that MacArthur was contributing to the trust to compensate existing asbestos claims was insufficient to entitle it to an injunction against future claims.

The bankruptcy court determined that the objectors had undervalued MacArthur's contribution because they had not included the value of its potential bad faith claims. The court found that, based on evidence presented at the confirmation hearing, MacArthur had "colorable claims for bad faith." Accordingly, the court stated, "some portion" of the $2 billion con-

tribution to the trust was attributable to those bad faith claims, but it disavowed that it was "deciding here the merit or specific value of any bad faith claim that was or could have been raised in a state court insurance coverage action." Thus the purpose of the court's finding was to clarify that MacArthur was able to contribute (and indeed, was contributing) something of adequate value to the trust in exchange for its insulation from further lawsuits.

It also bears mentioning that, during MacArthur's coverage action, USF&G raised at least one legitimate defense that found favor with the courts and cannot be attributed to bad faith. USF&G argued that MacArthur lacked standing to sue under insurance policies that USF&G had issued to Western Asbestos. In 1997, the California Court of Appeal held that MacArthur was neither the insured nor a proper beneficiary of the policy (*General Acc. Ins. Co. v Superior Ct.*, 55 Cal App 4th at 1454-1455). Although the issue was later resolved in MacArthur's favor when Western Asbestos was resurrected for the sole purpose of transferring the USF&G policies to MacArthur, USF&G cannot be faulted for litigating the issue (*see Bosetti v United States Life Ins. Co. in City of N.Y.*, 175 Cal App 4th 1208, 1237 ["(a)n insurer denying or delaying the payment of policy benefits due to the existence of a *genuine dispute* with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract"] [internal quotation marks and citation omitted]).

█ Insofar as defendants contend that the motion court also erred in stating that the settlement agreement was structured so that all losses were deemed to have occurred in 1959, we find that while the settlement agreement did not provide that those losses would be specifically allocated to that year, it was not improper for USF&G to do so in consultation with MacArthur and claimant's counsel. First, we must note again that, as with the alleged increase of the retention limit to $3 million, to require USF&G to spread the payment associated with each individual asbestos claimant over multiple policy years, thereby applying more than one reinsurance retention, would in all likelihood have left USF&G without reinsurance coverage. Next, USF&G has made it clear that 1959 was selected in order to provide a maximum benefit to the actual injured persons and because 1959 was the only policy year that covered every potential claimant. Neither do we find the law cited by defend-

ants to warrant a different result. California's "all sums" rule militates against spreading the loss across several policies, as it specifically forbids the stacking of policy limits (*see e.g. State of California v Continental Ins. Co.*, 88 Cal Rptr 3d 288, 301 [2009], *review granted* 203 P3d 425 [Cal 2009] ["in California, when there is a continuous loss spanning multiple policy periods, any insurer that covered any policy period is liable for the entire loss, up to the limits of its policy"] [emphasis omitted]). In addition, under California law, "[o]ther insurance clauses become relevant only where several insurers insure the same risk at the same level of coverage" (*Dart Indus., Inc. v Commercial Union Ins. Co.*, 28 Cal 4th 1059, 1078 n 6 [2002] [internal quotation marks and emphasis omitted]), and "[e]quitable contribution applies *only* between insurers" (*Aerojet-Gen. Corp. v Transport Indem. Co.*, 17 Cal 4th 38, 72 [1997] [citations omitted]). Neither does New York law favor the multiplication of deductibles (*see In re Prudential Lines Inc.*, 158 F3d 65, 86 [2d Cir 1998]).

We note, in brief, that the defendants' repeated invocation of this Court's prior decision in *Allstate Ins. Co. v American Home Assur. Co.* (43 AD3d 113 [2007], *lv denied* 10 NY3d 711 [2008]) is unavailing. The facts of that case are inapposite to the facts herein. In *Allstate*, the reinsured sought to maximize its recovery against the reinsurer by abandoning, in an environmental pollution clean up case, the one occurrence per polluted site allocation directed by a district court ruling and the multi-occurrence position taken by both sides in the underlying litigation and settlement negotiations. Here, by contrast, defendants have not demonstrated the existence of an issue of fact with evidence directly contradicting USF&G's evidence that in negotiating the settlement, the parties treated each asbestos injury as a separate accident.

### The Judgment

Finally, we note that ECRA contends that it was error for the motion court to enter judgment against it, as it ceased being a functioning entity in 1982. However, a review of the judgment demonstrates that the judgment was entered against ECRA and its constituent companies, assigning each of the constituent companies a specific dollar amount based on its percentage participation in the pool.

Accordingly, the judgment of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered October 25, 2010, in favor of plaintiffs in the amount of $420,425,536.15, and bringing up for review an order, same court and Justice, entered

August 20, 2010 and amended October 22, 2010, which granted plaintiffs' motion for summary judgment and denied defendants-appellants' motions for summary judgment, unanimously affirmed, without costs. Appeal from the aforesaid order unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

ABDUS-SALAAM, J. (dissenting). I respectfully dissent. There is a genuine triable issue of fact as to whether a portion of the $987.3 million settlement that United States Fidelity & Guaranty Company (USF&G) reached with Western MacArthur was for bad faith claims, which are not covered by the reinsurance treaty issued by defendants. Accordingly, I would deny plaintiffs' motion for summary judgment and vacate the judgment.

As an initial matter, while plaintiffs argue here that the treaty covers extra-contractual liabilities such as bad faith liability, the plain language of the treaty indicates otherwise. The treaty provides reinsurance for "any loss in connection with each policy," with certain exceptions, such as burglary and theft, health insurance and workers' compensation. A "loss" arises out of an "accident," and an "accident" is defined as an accident or occurrence arising out of products personal injury liability and products property damage liability, personal injury liability (other than automobile and products) and property damage liability (other than automobile and products). Bad faith damages incurred as a result of the reinsured's refusal to provide coverage to its insured do not fall within the ambit of a loss arising out of an accident as defined in the treaty (see *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 220 [2002] ["the requirement of a fortuitous loss is a necessary element of insurance policies based on either an 'accident' or 'occurrence' "]).

The exceptions to coverage that are listed could all arguably be considered losses arising out of an accident, and they are specifically excluded. Because bad faith damages cannot reasonably be considered to be a loss arising out of an accident, the absence of their mention in the exclusions to the policy is not probative when determining the coverage provided.

Plaintiffs' citation to *Peerless Ins. Co. v Inland Mut. Ins. Co.* (251 F2d 696, 704 [4th Cir 1958]) for the proposition that bad faith damages are a covered loss under the reinsurance treaty is unpersuasive. In *Peerless*, the court held that a reinsurer who acquiesced in the defense strategy not to settle a claim within

the policy limits, and knew as much about the underlying case as the insurer, was bound to follow the liability of the insurer and was thus liable to the insurer for damages paid to settle a negligence action brought by the insured for failure to settle. There is no evidence here that defendants participated in the handling of Western MacArthur's claim against USF&G, or acquiesced in plaintiffs' strategy to deny that the underlying policies provided coverage to Western MacArthur. Even if defendants had participated, a "follow the fortunes" clause does not serve to create coverage where there is none (*see Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583, 596 [2001] [a "follow the fortunes" clause "does not alter the terms or override the language of reinsurance policies"]; *see also North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194, 1206 [1995] ["(w)here the reinsured's liability attaches from a settlement or binding judgment, the reinsurer is not accountable if the liability arises from uninsured activity"] [citation omitted]). Thus, the majority is incorrect when it concludes that all of defendants' efforts to second guess plaintiffs' decisions, *including the settlement of bad faith claims which are not covered*, are precluded by virtue of the "follow the fortunes" clause.

The motion court erred when it concluded that defendants had not presented evidence to raise a triable issue of fact as to whether a portion of the settlement was attributable to Western MacArthur's bad faith claim against USF&G (2010 NY Slip Op 32441[U] [2010]). There is ample evidence, including the findings made by the bankruptcy court, and the record in the underlying coverage action brought by Western MacArthur against USF&G, to support defendants' position that part of the settlement represented bad faith damages.

I disagree with the majority's analysis that whether plaintiffs actually engaged in bad faith is of no moment "because the parties present at the settlement negotiations agreed that the settlement amount included no payment for settlement of bad faith claims." In fact, it is evident from the bankruptcy court's decision that the court would not have approved the bankruptcy plan if it believed that there had been no payment for bad faith claims. This matter was not merely addressed "tangentially" by the bankruptcy court, as found by the majority, but was an essential element of the court's approval.

In concluding that defendants had not raised any issue of fact, the motion court and the majority note that the bank-

ruptcy court stated it was not determining the merit or potential value of any bad faith claim. However, the bankruptcy court made some determinations which clearly demonstrate the court concluded that bad faith damages had been part of the settlement and that contribution by Western MacArthur of their bad faith claims to the trust in order to pay asbestos claims against the debtors was integral to the court's confirmation of the bankruptcy plan. Responding to the objecting insurers' assertion that the debtors had not contributed enough to the trust, the court stated:

> "This argument ignores the value of the Debtors' bad faith claims against Settling Insurers . . . [T]he evidence presented at the confirmation hearing convinced the Court that the Debtors had colorable claims for bad faith against each of these two insurers. While the Court cannot allocate to these bad faith claims a specific percentage of the settlement amounts, even if the bad faith claims represent only ten percent of the settlement amount, this gives them a value of approximately $200 million" (*In re Western Asbestos Co. et al.*, Bankr Ct, ND CA, case No. 02-46284 T, at 24-25 [Feb. 3, 2004, Tchaikovsky, J.]).

The bankruptcy court also determined that the debtors are contributing "business loss claims" to the trust, which "include their potential bad faith claims against USF&G and Hartford as well as the remaining Objecting Insurers" (*id.* at 63).

> "As discussed in connection with the USF&G and Hartford Settlement Agreements, there was substantial evidence to support the Debtor's bad faith claims against USF&G and Hartford.[40] *Some portion of the over $2 billion being contributed to the Trust pursuant to the USF&G and Hartford Settlement Agreements must be attributed to those claims.* These claims belong to the Debtors, not to the asbestos claimants. While the Court is not able to ascribe a specific value to these claims, the Court is persuaded that their value is in excess of the value of the Debtors' net liquidation value: i.e., $17 million. The Court finds the contribution of the Debtors' bad faith claims sufficient to justify the issuance of an 11 USC §§ 524 (g) injunction.

"[40]As noted above, by finding that the Debtors' bad faith claims were of sufficient value to justify the issuance of the injunctions, the Court is not actually deciding the merits or specific value of the Debtors' potential bad faith claims against any insurer" (*id.* at 64 [emphasis supplied]).

Contrary to the majority's position, these findings by the bankruptcy court are clearly more than just a recognition that evidence of bad faith allegations existed. While the majority acknowledges many of the bankruptcy court's findings, it reaches the mystifying conclusion that there is no genuine issue as to whether the settlement included bad faith damages. The majority is apparently persuaded that because counsel involved in the settlement have stated that the settlement represented only compensatory damages, the bankruptcy court's determination that some portion of the settlement was for bad faith claims is irrelevant. Although I concur that defendants are mistaken when they urge that collateral estoppel prevents us from considering the issue of bad faith, I do not agree with the majority that there are no issues of fact.

Significantly, examination of the record in the underlying coverage litigation between Western MacArthur and USF&G buttresses the bankruptcy court's conclusion that there was substantial evidence to support the bad faith claims against USF&G, and that payment for these bad faith claims was a part of the settlement. The litigation in California state court between Western MacArthur and USF&G dragged on for nine years. While the majority emphasizes that plaintiffs had, for most of those years, a legitimate basis for declining coverage based on a defense that Western MacArthur was not its insured or a proper beneficiary of the policy, it is the other defenses, and the missing policies, that were the basis of the bad faith claims, as detailed below. USF&G took the position that its policies (which neither party could locate) did not provide products liability coverage, and that even if there were such coverage, the policies would have contained aggregate limits on such coverage. USF&G, the insurance company that maintained it did not possess copies of its own policies, was nonetheless certain that the policies did not cover the claims brought by individuals with health-related injuries due to exposure to asbestos.

During the course of the coverage litigation, it was discovered that USF&G had "donated" documents establishing the existence of coverage to the Baltimore Museum of Industry. And at

trial, Western MacArthur presented secondary evidence that USF&G's "lost" policies provided products coverage *without* the aggregate limits that USF&G had steadfastly insisted were in the policies. It was during this phase of the trial that the Western MacArthur action settled.

Additionally, a reading of the California trial court's rulings on a motion by USF&G for summary adjudication of Western MacArthur's bad faith claims and in limine motions is illuminating. The insurer's motion for summary judgment was denied, the court finding triable issues of fact as to whether USF&G acted in bad faith by alleged conduct including destruction of insurance policies, falsely stating that it had no documents in its possession, "donation" of key documents to a museum without ever informing plaintiffs that it had done so, and interfering with a subpoena that Western MacArthur had obtained in order to review the documents that had been "donated" to the museum (*Western MacArthur v USF&G*, Super Ct of CA, Sept. 12, 2001, Kawaichi, J., case No. 721595-7).

A motion in limine by USF&G "to exclude evidence that USF&G donated documents to the Baltimore Museum of Industry and motion to exclude evidence regarding USF&G's failure to produce documents from its 'Claims Legal Collection' " was denied (*Western MacArthur v USF&G*, Super Ct of CA, Mar. 22, 2002, Sabraw, J., case No. 721595-7), as was another in limine motion by USF&G to exclude evidence or argument that USF&G had destroyed documents as part of a "1984 Document Destruction Program." The court ruled:

> "Plaintiffs may present evidence of the 1984 document Destruction Program; i.e., evidence inferring that the destruction of documents was done willfully due to USF&G's concerns about a 'litigation crisis' and asbestos liability under old policies and that USF&G's intent in destroying the documents was to make it more difficult for insureds to establish coverage and the terms and conditions of their policies" (*id.* at 4).

In sum, the record raises a genuine issue of fact as to whether the settlement of the underlying coverage action included payment of bad faith damages. Thus, summary judgment in favor of plaintiffs was not warranted.

TOM, J.P., SAXE and FREEDMAN, JJ., concur with ACOSTA, J.; ABDUS-SALAAM, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered October 25, 2010, and bringing up for review an order, same court and

Justice, entered August 20, 2010 and amended October 22, 2010, affirmed, without costs. Appeal from the aforesaid order dismissed, without costs, as subsumed in the appeal from the judgment.