[985 NE2d 876, 962 NYS2d 566]

UNITED STATES FIDELITY & GUARANTY COMPANY et al., Respondents, v AMERICAN RE-INSURANCE COMPANY et al., Appellants, et al., Defendants.

Argued January 2, 2013; decided February 7, 2013

## POINTS OF COUNSEL

*Wachtell, Lipton, Rosen & Katz*, New York City (*Herbert M. Wachtell, Ben M. Germana* and *Michael J. McDuffie* of counsel), for American Re-Insurance Company, appellant. I. The Appellate Division erred in upholding summary judgment for United States Fidelity & Guaranty Company based upon an overbroad and erroneous legal interpretation of the follow the fortunes doctrine. (*Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Matter of Union Indem. Ins. Co. of N.Y.*, 89 NY2d 94; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576; *North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194; *Insurance Co. v Associated Manufacturers' Corp.*, 70 App Div 69, 174 NY 541; *Christiania Gen. Ins. Corp. of N.Y. v Great Am. Ins. Co.*, 979 F2d 268; *Hartford Acc. & Indem. v Columbia Cas. Co.*, 98 F Supp 2d 251.) II. Reversal of summary judgment is independently required in that there is a triable issue of fact as to whether the parties' conceded retroactive agreement to change the treaty retention level reached back to the years at issue. (*Columbus Trust Co. v Campolo*, 110 AD2d 616, 66 NY2d 701; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583.)

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Kathleen M. Sullivan, Jane M. Byrne, J. Toji Calabro, Brad Evan Rosen* and *Cleland B. Welton II* of counsel), and *Boies, Schiller & Flexner, LLP*, Albany (*George F. Carpinello* and *Benjamin D. Battles* of counsel), for Excess Casualty Reinsurance Association and others, appellants. I. Follow the fortunes does not preclude all judicial review of an insurer's allocation of losses to its reinsurer. (*Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *North Riv.*

*Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194; *Continental Cas. Co. v Stronghold Ins. Co., Ltd.*, 77 F3d 16; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Affiliated F.M. Ins. Co. v Employers Reins. Co.*, 369 F Supp 2d 217; *Hartford Acc. & Indem. v Columbia Cas. Co.*, 98 F Supp 2d 251; *Employers Reins. Corp. v Newcap Ins. Co., Ltd.*, 209 F Supp 2d 1184; *American Employers' Ins. Co. v Swiss Reins. Am. Corp.*, 413 F3d 129; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143; *Dalton v Educational Testing Serv.*, 87 NY2d 384.) II. Summary judgment for United States Fidelity & Guaranty Company was improper because the reinsurers raised material disputes of fact as to whether United States Fidelity & Guaranty Company's post-settlement allocation was made in good faith. (*Negri v Stop & Shop*, 65 NY2d 625; *F. Garofalo Elec. Co. v New York Univ.*, 300 AD2d 186; *Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395; *Christiania Gen. Ins. Corp. of N.Y. v Great Am. Ins. Co.*, 979 F2d 268; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Hartford Acc. & Indem. v Columbia Cas. Co.*, 98 F Supp 2d 251; *Pavia v State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445; *Bellefonte Reins. Co. v Aetna Cas. & Sur. Co.*, 903 F2d 910; *Matter of Midland Ins. Co.*, 87 AD3d 487.) III. Summary judgment for United States Fidelity & Guaranty Company was improper because there are material disputes of fact as to the amount of the retention in the applicable reinsurance treaty years. (*Gulf Ins. Co. v Transatlantic Reins. Co.*, 69 AD3d 71; *Federal Ins. Co. v Americas Ins. Co.*, 258 AD2d 39; *Webster's Red Seal Publs. v Gilberton World-Wide Publs.*, 67 AD2d 339; *Koester v Rochester Candy Works*, 194 NY 92; *Navedo v 250 Willis Ave. Supermarket*, 290 AD2d 246; *Giandana v Providence Rest Nursing Home*, 32 AD3d 126, 8 NY3d 859; *Matter of Anthus v Rail Joint Co.*, 193 App Div 571; *Reed v McCord*, 160 NY 330; *Nemeroff v Coby Group*, 54 AD3d 649.)

*Simpson Thacher & Bartlett LLP*, New York City (*Mary Kay Vyskocil, Chet A. Kronenberg, Ryan A. Kane* and *Jonathan M. Weiss* of counsel), for respondents. I. The court should reject appellants' attempt to distort the follow the fortunes doctrine beyond recognition and denude it of any force and effect. (*Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F Supp 917; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.*, 9 F Supp 2d 49, 217 F3d 33; *Travelers Cas. & Sur. Co.*

*v Gerling Global Reins. Corp. of Am.*, 419 F3d 181; *North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134; *National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.*, 441 F Supp 2d 646; *Granite State Ins. Co. v ACE Am. Reins. Co.*, 46 AD3d 436; *Mentor Ins. Co. [U.K.] Ltd. v Brannkasse*, 996 F2d 506; *Champion Intl. Corp. v Continental Cas. Co.*, 400 F Supp 978, 546 F2d 502.) II. The decisions by United States Fidelity & Guaranty Company that appellants denominate "post-settlement allocation decisions" were *all* integral to the settlement itself and under follow the fortunes principles may not be second-guessed. (*International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F Supp 917; *North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576; *Granite State Ins. Co. v ACE Am. Reins. Co.*, 46 AD3d 436.) III. All parties to the settlement have sworn that the settlement did not encompass any amounts on account of bad faith and appellant reinsurers have no evidence to contradict this indisputable fact. (*National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.*, 441 F Supp 2d 646; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194; *Aetna Cas. & Sur. Co. v Home Ins. Co.*, 882 F Supp 1328; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576; *Peerless Ins. Co. v Inland Mut. Ins. Co.*, 251 F2d 696; *Grullon v City of New York*, 297 AD2d 261; *American Ins. Co. v North Am. Co. for Prop. & Cas. Inc.*, 697 F2d 79; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.*, 9 F Supp 2d 49; *Liberty Mut. Ins. Co. v Rotches Pork Packers, Inc.*, 969 F2d 1384.) IV. Appellant reinsurers' complaints about United States Fidelity & Guaranty Company's allocation of the losses to the 1959 treaty year is an improper attempt to dissect the settlement itself and is without merit. (*Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.*, 441 F Supp 2d 646; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.*, 9 F Supp 2d 49; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134; *Aetna Cas. & Sur. Co. v Home Ins. Co.*, 882 F Supp 1328; *Simplexdiam, Inc. v Brockbank*, 283 AD2d 34; *In re Prudential Lines Inc.*, 158 F3d 65; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576.) V. Appellants cannot avoid their

indemnification obligations simply because United States Fidelity & Guaranty Company, like appellant reinsurers, sought to determine its potential net exposure prior to entering into the settlement. (*Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143; *Insurance Co. v Associated Manufacturers' Corp.*, 70 App Div 69; *Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181.) VI. Appellants' argument that the parties orally agreed to increase the retention amount in the treaty—made for the first time six years into this litigation—is baseless and contrary to appellants' own pleading. (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157; *Stevens & Thompson Paper Co., Inc. v Niagara Mohawk Power Corp.*, 49 AD3d 1011; *Stroll v Epstein*, 818 F Supp 640; *Chimart Assoc. v Paul*, 66 NY2d 570; *Matter of Union Indem. Ins. Co. of N.Y.*, 162 AD2d 398; *George Backer Mgt. Corp. v Acme Quilting Co.*, 46 NY2d 211; *Resort Sports Network Inc. v PH Ventures III, LLC*, 67 AD3d 132.)

*Freeborn & Peters LLP*, Chicago, Illinois (*Thomas R. Fawkes* of counsel), for Reinsurance Association of America, amicus curiae. I. Follow the fortunes is a key reinsurance doctrine with carefully defined scope of application. (*Matter of Union Indem. Ins. Co. of N.Y.*, 89 NY2d 94; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576; *Aetna Cas. & Sur. Co. v Home Ins. Co.*, 882 F Supp 1328; *Compagnie de Reassurance d'Ile de France v New England Reins. Corp.*, 944 F Supp 986; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Granite State Ins. Co. v ACE Am. Reins. Co.*, 46 AD3d 436; *Hartford Acc. & Indem. v Columbia Cas. Co.*, 98 F Supp 2d 251; *Mentor Ins. Co. [U.K.] Ltd. v Brannkasse*, 996 F2d 506.) II. The Appellate Division misinterpreted and misapplied the follow the fortunes doctrine. (*Affiliated F.M. Ins. Co. v Employers Reins. Co.*, 369 F Supp 2d 217; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583.) III. The decision below is inconsistent with the purpose of follow the fortunes, creates incentives for misconduct, and presents new risks and uncertainties in the reinsurance industry.

*Goldberg Segalla LLP*, New York City (*James J. Wrynn* of counsel), amicus curiae. I. The follow the fortunes doctrine provides risk transfer certainty. (*North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194; *Sumitomo Mar. & Fire Ins. Co.—U.S. Branch v Cologne Reins. Co. of Am.*, 75 NY2d 295; *Aetna Cas. &*

*Sur. Co. v Home Ins. Co.*, 882 F Supp 1328; *Mentor Ins. Co. [U.K.] v Brannkasse*, 996 F2d 506; *National Union Fire Ins. Co. of Pittsburgh, Pa. v American Re-Insurance Co.*, 351 F Supp 2d 201; *International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F Supp 917; *North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134; *National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.*, 441 F Supp 2d 646; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143; *Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181.) II. Commercial certainty and insurer solvency depend upon liberal risk transfer from insurer to reinsurer.

*Reed Smith LLP*, New York City (*John N. Ellison* and *Jill N. Averett* of counsel), and *Amy Bach*, San Francisco, California, for United Policyholders, amicus curiae. I. The purpose of insurance is to insure. (*Matter of Union Indem. Ins. Co. of N.Y.*, 89 NY2d 94.) II. To protect policyholders, primary insurance companies must have prompt access to reinsurance. (*National Union Fire Ins. Co. of Pittsburgh, PA v American Re-Ins. Co.*, 441 F Supp 2d 646; *Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181; *International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F Supp 917.) III. Reinsurance companies are not—and should not—be claims handlers. IV. Reinsurers' interpretation of follow the fortunes would discourage settlements and create endless litigation. (*North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143.) V. Allegations of bad faith do not on their own allow an inference that the basis of a settlement is bad faith. (*Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181; *Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.*, 4 F3d 1049; *North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.*, 9 F Supp 2d 49; *Aetna Cas. & Sur. Co. v Home Ins. Co.*, 882 F Supp 1328; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113; *Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143.)

### OPINION OF THE COURT

SMITH, J.

An insurance company, United States Fidelity & Guaranty Company (USF&G), having settled asbestos claims for nearly a

billion dollars, seeks to recover a share of its settlement payment from its reinsurers. The courts below granted summary judgment for USF&G. We modify the Appellate Division's order to deny summary judgment on two issues, and otherwise affirm.

We conclude, as did the dissenting Justice in the Appellate Division, that there is an issue of fact as to whether USF&G, in allocating the settlement amount, reasonably attributed nothing to the so called "bad faith" claims made against it. We also find a factual issue as to whether certain claims were given unreasonable values for settlement purposes. However, we hold that the courts below correctly rejected the reinsurers' other defenses.

## I

From 1948 or earlier until mid-1960, USF&G was one of the liability insurers of Western Asbestos Company, a distributor of asbestos products. The business of Western Asbestos was taken over in the 1960s by Western MacArthur Company, a subsidiary of Mac Arthur Corporation. (The difference between the subsidiary and the parent is unimportant here, and we will refer to both as "MacArthur.") It was eventually decided that MacArthur was liable for personal injury claims arising out of exposure to the products that Western Asbestos had sold (*Kaminski v Western MacArthur Co.*, 175 Cal App 3d 445, 220 Cal Rptr 825 [1985]). By 1991, such claims had apparently exhausted MacArthur's own insurance coverage, and MacArthur demanded a defense from Western Asbestos's insurers, including USF&G. USF&G refused the demand, and in 1993 MacArthur brought suit in a California state court against USF&G and others to establish the existence of coverage.

USF&G relied principally on two grounds in defense of the coverage litigation. First, in the decades that passed between the issuance of the USF&G policies and the claims made under them, the policies themselves had been lost; USF&G took the position that MacArthur, lacking copies of the policies, could not prove that they had ever been issued. Secondly, USF&G argued that it had, at most, insured only Western Asbestos, not MacArthur, and had no obligation to defend the latter company.

USF&G's first line of defense did not fare well. Although the policies themselves had disappeared, other documents, including the form of policy used by USF&G at the time, and documents showing that Western Asbestos was among its insureds, sufficed to prove both the existence of the policies and their terms. In 2001, more than seven years after the litigation began,

USF&G acknowledged that it had had an insurance relationship with Western Asbestos during the years in question.

But USF&G initially prevailed on its second argument. A California Court of Appeal held in 1997 that MacArthur, though it was liable on claims made against Western Asbestos, did not succeed by operation of law to Western Asbestos's liability insurance (*General Acc. Ins. Co. of Am. v Superior Ct. of Cal., Alameda County*, 55 Cal App 4th 1444, 64 Cal Rptr 2d 781 [1997]). This victory proved hollow, however, because MacArthur obtained an assignment of Western Asbestos's rights, and in 2002 the trial court in the coverage litigation held that USF&G lacked standing to challenge the assignment.

While the coverage litigation wore on, MacArthur's underlying liability to the asbestos claimants grew. After Western Asbestos's insurers refused to defend MacArthur, MacArthur agreed not to oppose the entry of default judgments against it in favor of the asbestos claimants; in exchange the asbestos claimants, hoping for a favorable outcome of the coverage litigation, agreed to refrain from executing against MacArthur on the judgments. According to figures used in settlement negotiations, there were by 2002 more than a thousand such default judgments, totaling $1.4 billion without interest. MacArthur faced additional risks from pending and possible future claims.

USF&G had not insured the full amount of MacArthur's liability. The policies it issued to Western Asbestos contained "per person" and "per accident" limits in varying amounts; the highest per person limit was $200,000. But the policies contained no aggregate limit; USF&G could be liable under the policies for any number of separate claims. In addition, MacArthur alleged in the coverage litigation that USF&G had, by refusing to defend the asbestos claimants' lawsuits, breached its implied covenant of good faith and fair dealing. These "bad faith" claims, if successful, could have led to a judgment against USF&G for whatever liability of MacArthur was found to be attributable to USF&G's failure to defend—without regard for policy limits.

The coverage suit went to trial in 2002, and was settled in June of that year, while the trial was in progress. The settlement required USF&G to pay a total of $975 million to resolve the asbestos claims, plus $12.3 million in fees to counsel for the asbestos claimants. As part of the settlement, MacArthur was to file for bankruptcy, and a trust was to be created, as authorized

by the Bankruptcy Code, to assume MacArthur's asbestos-related liabilities (*see* 11 USC § 524 [g] [1], [2] [B] [i] [I]).

Having settled the coverage case, USF&G turned to its reinsurers, defendants in this case, with whom it had entered into a "treaty" of reinsurance applicable to the years 1956 through 1962. The reinsurance was of the type known as "excess of loss": the reinsurers agreed to pay to USF&G the amount over $100,000 of any loss occurring during the period covered by the treaty. Since USF&G's loss in the asbestos litigation could not, under its policies, exceed $200,000 per claimant, the reinsurers' liability was in effect capped at $100,000 per loss. But the reinsurance treaty, like the underlying policies, had no aggregate limit—the reinsurers could be liable for any number of losses, up to $100,000 each.

USF&G calculated the reinsurers' obligation to it at approximately $391 million, a calculation determined by USF&G's allocation of the settlement payment, which was based on assumptions we will describe below. The reinsurers refused to pay, and this action followed. Some reinsurers have settled with USF&G, but approximately $262 million (not including interest) remains in dispute.

Supreme Court granted summary judgment to USF&G (2010 NY Slip Op 32441[U] [2010]). The Appellate Division affirmed, with one Justice dissenting on the ground that "[t]here is a genuine triable issue of fact as to whether a portion of the . . . settlement . . . was for bad faith claims" (*United States Fid. & Guar. Co. v American Re-Ins. Co.*, 93 AD3d 14, 27 [1st Dept 2012, Abdus-Salaam, J., dissenting]). The Appellate Division granted the reinsurers leave to appeal, and we now modify the Appellate Division's order.

## II

The reinsurers' main arguments are challenges to USF&G's allocation of the settlement payment—i.e., the amounts that USF&G attributed to each of the claims made against it, and to each of the policies under which the claims were made, when it billed the reinsurers. The reinsurers say that USF&G's allocation minimizes the burden on itself and maximizes the cost to the reinsurers, and that the reinsurers are not bound by it. To analyze the issues the reinsurers raise, we must first identify some rules of law that govern the allocation of settlement payments for reinsurance purposes.

The reinsurance treaty at issue here contained, as contracts of reinsurance commonly do, what is often referred to as a "follow the fortunes" or "follow the settlements" clause (*see generally* Staring, Law of Reinsurance ch 18 at 407-468 [2012] [hereafter Staring]). We will use the latter term. The follow the settlements clause says:

> "All claims in which this reinsurance is involved, when allowed by the Company [USF&G], shall be binding upon the Reinsurers, which shall be bound to pay or allow, as the case may be, their proportion of such loss. It is understood, however, that when so requested, the Company will afford the Reinsurers an opportunity to be associated with the Company, at the expense of the Reinsurers, in the defense of any claim or suit or proceeding involving this reinsurance, and the Company and the Reinsurers shall cooperate in every respect in the defense or control of such claim or suit or proceeding, provided that the Company shall have the right to defend, settle, or compromise any such claim, suit or proceeding, and such action on the part of the Company shall be binding upon the Reinsurers."

It is well established, and the parties here do not dispute, that a clause like this ordinarily bars challenge by a reinsurer to the decision of a party in USF&G's position—called in reinsurance jargon the "cedent," because it has ceded part of its risk to its reinsurers—to settle a case for a particular amount (*see* Staring § 18.6 at 434-447). That rule usually creates little risk of unfairness because, in deciding whether and for how much to settle, the interests of cedent and reinsurer will normally be aligned; both will want the cheapest settlement possible. There are exceptions to this generalization, but they do not concern us here, because the reinsurers do not challenge USF&G's decision to settle MacArthur's lawsuit, nor do they assert that USF&G overpaid in the settlement. Rather, they challenge the way the settlement was allocated.

As the reinsurers point out, the application of a follow the settlements clause to allocation decisions raises problems, because in that context the interests of cedent and reinsurer will often conflict. This case can serve as an illustration. Under the reinsurance treaty, the first $100,000 of every loss must be borne by USF&G, and the second $100,000 by the reinsurers. If the settlement were allocated entirely to losses amounting to $100,000 or less, the whole cost would be borne by USF&G and

the reinsurers would pay nothing; but if it were allocated entirely to losses of $200,000 each, the reinsurers would bear half the cost. Because conflicts of this kind will occur often, the reinsurers argue, cedents' allocation decisions should not bind reinsurers under a follow the settlements clause.

■ There is logic to this argument, but almost all courts to consider the question have held, and we join them in holding, that a follow the settlements clause does require deference to a cedent's decisions on allocation (*see Travelers Cas. & Sur. Co. v Insurance Co. of N. Am.*, 609 F3d 143, 157-159 [3d Cir 2010] [hereafter *Travelers v INA*] [applying New York law]; *Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.*, 419 F3d 181, 186-190 [2d Cir 2005] [hereafter *Gerling*]; *North Riv. Ins. Co. v ACE Am. Reins. Co.*, 2002 WL 506682, *2-3, 2002 US Dist LEXIS 5536, *4-9 [SD NY 2002], *affd in relevant part* 361 F3d 134, 139-141 [2d Cir 2004]; *Hartford Acc. & Indem. v Columbia Cas. Co.*, 98 F Supp 2d 251, 258 [D Conn 2000]; *Commercial Union Ins. Co. v Seven Provinces Ins. Co., Ltd.*, 9 F Supp 2d 49, 67-68 [D Mass 1998], *affd* 217 F3d 33 [1st Cir 2000]; *but see Employers Reins. Corp. v Newcap Ins. Co., Ltd.*, 209 F Supp 2d 1184, 1190-1191 [D Kan 2002]; *see generally* Staring § 18:10 at 455-465). As other courts have observed, there seems to be no good alternative to giving a measure of deference to a cedent's allocation decisions. To review each decision de novo would invite long litigation over complex issues that courts may not be well equipped to resolve, creating cost and uncertainty and making the reinsurance market less efficient (*see Commercial Union*, 9 F Supp 2d at 67-68; *North Riv.*, 2002 WL 506682, *3, 2002 US Dist LEXIS 5536, *7-8; *North Riv.*, 361 F3d at 140-141). Deference to a cedent's decisions makes for a more orderly and predictable resolution of claims.

The language of the follow the settlements clause in this case supports the conclusion that precedent and policy suggest. The words "[a]ll claims . . . when allowed by the Company, shall be binding upon the Reinsurers" imply discretion in the cedent to decide which claims should be considered "allowed," and to what extent. And the clause gives the reinsurers a measure of protection against abuse by allowing the reinsurers to take a role in defending claims and requiring that the cedent and the reinsurers "cooperate in every respect in the defense or control" of claims, while preserving the cedent's right "to . . . settle, or compromise any such claim" by action that "shall be binding upon the Reinsurers." If reinsurers think that they are not

adequately protected by this language, their remedy is to negotiate better terms.

But to say that a cedent's allocation decisions are entitled to deference is not to say that they are immune from scrutiny. Recognizing that the cedent's and the reinsurer's interests will often conflict, courts generally hold that a reinsurer is bound only by a cedent's "good faith" decisions. While that expression might seem to suggest that the cedent's subjective intentions are critical, most decisions also consider reasonableness or some other objective element (see *Commercial Union*, 9 F Supp 2d at 68 [deferring to "good faith and reasonable" allocation]; *Hartford Acc.*, 98 F Supp 2d at 258-260 [rejecting deference if "gross negligence or recklessness" could be shown]; *North Riv.*, 361 F3d at 141 [cedents "must make good-faith allocations"]; *Gerling*, 419 F3d at 191-193 [a cedent may choose among "reasonable allocation possibilities"]; *Travelers v INA*, 609 F3d at 158-159 [allocation must be "legitimate" or "credible"]). This approach is consistent with our own in *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London* (96 NY2d 583, 596-597 [2001]), where we held that a follow the settlements clause "does not alter the terms or override the language of reinsurance policies," and rejected a cedent's attempt to "allocate" to certain reinsurance treaties losses that the treaties simply did not cover.

In our view, objective reasonableness should ordinarily determine the validity of an allocation. Reasonableness does not imply disregard of a cedent's own interests. Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own. As the Third Circuit put it in *Travelers v INA*:

> "[T]o establish a breach of the duty of good faith, it is not sufficient simply to demonstrate that a particular allocation decision increased the insurer's access to reinsurance, at least not where the insurer is able to point to some legitimate (i.e., non-reinsurance-related) reason for the challenged decision" (609 F3d at 158-159).

We mean by "reasonable" essentially what we take the Third Circuit to mean by "legitimate": The reinsured's allocation must be one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist.

The Third Circuit said that a cedent's allocation could be rejected if the cedent's allocation was not "credible"—a word seemingly used to mean the same thing as "legitimate" or "reasonable"—or if the cedent "was motivated primarily by reinsurance considerations" (*id.* at 159). We conclude, however, that the cedent's motive should generally be unimportant. When several reasonable allocations are possible, the law, as several courts have recognized, permits a cedent to choose the one most favorable to itself (*see id.*; *Gerling*, 419 F3d at 193 [an "allocation that increases reinsurance recovery . . . would rarely demonstrate bad faith in and of itself"]). We think it unrealistic to expect that the cedent will not be guided by its own interests in making the choice.

But the choice must be a reasonable one, and we also conclude that reasonableness cannot be established merely by showing that the cedent's allocation for reinsurance purposes is the same as the allocation that the cedent and the insurance claimants actually adopted in settling the underlying insurance claims. The fact that they did adopt it does not prove that they would have, or reasonably could have, adopted it if reinsurance did not exist. In this case, the record shows that the allocation USF&G used in billing the reinsurers was one that it discussed and agreed on in negotiations with MacArthur and the asbestos claimants. We reject USF&G's argument that this in itself establishes the validity of the allocation.

Again, we follow what we take to be the view of the Third Circuit in *Travelers v INA*. Like the Third Circuit, "[w]e are reluctant to adopt a rule whereby an insurer could insulate its allocation from challenge by its reinsurer simply by getting its, essentially indifferent, insured to agree to it" (609 F3d at 159 n 25). Indeed, we will put the point more strongly than the Third Circuit did: in many cases claimants and insureds (i.e., those in the position of the asbestos claimants and MacArthur here), far from being indifferent, will enthusiastically support insurers' efforts to fund a settlement at reinsurers' expense. They will do this for the simple reason that insurers, like everyone else, are apt to be more generous with other people's money than their own.

In sum, under a follow the settlements clause like the one we have here, a cedent's allocation of a settlement for reinsurance purposes will be binding on a reinsurer if, but only if, it is a reasonable allocation, and consistency with the allocation used in

settling the underlying claim does not by itself establish reasonableness. We now consider whether USF&G's allocation decisions in this case were reasonable as a matter of law, thus entitling USF&G to the summary judgment that it was granted by the courts below.

## III

The significant, disputed assumptions underlying USF&G's settlement allocation were: (1) that all of the settlement amount was attributable to claims within the limits of USF&G's policies, and none of it to the claims that USF&G acted in bad faith when it refused to defend MacArthur in asbestos litigation; (2) that claims by claimants suffering from lung cancer had a value of $200,000 each, while certain other claims had values of $50,000 or less; and (3) that USF&G's entire payment should be attributed to the policy in force in 1959—the last full year in which USF&G was Western Asbestos's liability insurer. We consider whether these assumptions might reasonably have been the basis for an arm's length settlement among the asbestos claimants, MacArthur and USF&G if reinsurance were not in the picture. We conclude that the reasonableness of the first two, but not the third, of these assumptions presents issues of fact.

The Bad Faith Claims

The decision to allocate all the settlement to claims within the policy limits, and nothing to the claims for bad faith, worked to USF&G's advantage because the bad faith claims were not covered by reinsurance. The reinsurance treaty covered "loss in connection with each policy" of USF&G in effect at the relevant time; these words, read with a common-sense appreciation of the risks that reinsurers could reasonably be expected to take, must be interpreted to mean losses for which USF&G was liable under its policies—not losses for which it became liable by failing in bad faith to observe the policies' terms (see Staring § 18:7 [1] at 447; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Clearwater Ins. Co.*, 2007 WL 2106098, *2, 2007 US Dist LEXIS 52770, *4-6 [SD NY 2007]; *American Ins. Co. v North Am. Co. for Prop. & Cas. Ins.*, 697 F2d 79, 81 [2d Cir 1982]).

There is evidence in the record from which a factfinder could conclude that an allocation giving no value to the bad faith claims was unreasonable. The more important features of that evidence may be summarized as follows:

First, it could be found that USF&G faced a significant risk of an adverse verdict on the bad faith claims. It had taken a very

aggressive position in refusing to admit, for almost a decade, that it had ever written liability insurance that covered the asbestos claimants' claims—a position that it abandoned at a late stage of the coverage litigation, in the face of strong proof that coverage existed. It could be found that USF&G knew, well before it admitted, that it did indeed provide such coverage, and that its litigation position was an irresponsible attempt to exploit the fact that, with the passage of time, the policies it issued had disappeared. It could also be found that USF&G's refusal to defend MacArthur resulted in the many large default judgments with which MacArthur was faced.

Admittedly, USF&G had a plausible defense to the bad faith claims. Its refusal to acknowledge the existence of the policies was not its only reason for refusing to defend MacArthur. It also refused on the alternative ground that, even if it insured Western Asbestos, it did not insure MacArthur—and that defense was accepted by the California courts, though it was later nullified by an assignment. It was not until 2002 that the California trial court held the assignment unchallengeable by USF&G—a holding that was even then still subject to appeal. It could hardly be argued that this second ground for refusing to defend MacArthur was not advanced in good faith.

USF&G's argument is, in substance, that since one of its two grounds for refusing to defend was asserted in good faith, the possible bad faith of the other was inconsequential. Perhaps this argument would persuade us, if we were the court adjudicating the bad faith claims, but we are not. The California trial court before whom those claims were pending was evidently not persuaded: it denied USF&G's motion for summary adjudication on the bad faith claims, and also denied, at the outset of the coverage trial, a motion in limine to exclude some evidence thought to be relevant to those claims.

Thus, when the coverage case went to trial, USF&G was faced with the possibility of a jury verdict—possibly a very large one—against it on the bad faith claims, with the uncertain comfort of having a logically persuasive argument that it could assert on appeal. It is a fact of life, well known to insurance companies, that logically persuasive arguments do not always win cases for defendants that juries or courts may think have acted outrageously. It was therefore arguably not reasonable, at the time the coverage litigation was settled, to say that the bad faith claims had no value.

Secondly, it could be found that USF&G, in allocating the settlement, assigned inflated values to claims other than the bad faith claims—i.e., to claims that were covered in part by reinsurance. As we explained above, under its policies with Western Asbestos, USF&G could be liable for no more than $200,000 to each claimant; and under the reinsurance treaties, the amount exceeding $100,000 of each loss (i.e., half of each $200,000 loss) was the reinsurers' responsibility.

In allocating its settlement payment, USF&G classified the claims according to the disease from which the claimant suffered. It seems to be undisputed (and in any event, it is clear from the record) that the claims for the most serious disease, mesothelioma, were reasonably valued above the $200,000 cap. But USF&G also valued each claim by a claimant suffering from lung cancer at $200,000—thus allocating the maximum payment to each such claim. According to affidavits submitted in this case, this allocation was agreed to, in the settlement negotiations, by MacArthur and the asbestos claimants; but we do not, for the reasons we explained above (at 421-422), assign dispositive weight to their agreement. At an earlier stage of the coverage litigation, an expert retained by the asbestos claimants estimated MacArthur's liability for each lung cancer claim at $91,174. It is unusual for claims to be settled for more than twice what the claimant's expert has asserted they are worth. A factfinder could conclude that the lung cancer claims were priced at an unreasonably high level, and included value that should have been attributed to the bad faith claims.

Thirdly, while the people who negotiated the settlement of the coverage litigation all agreed that the settlement gave no value to the bad faith claims, a demand made shortly before the settlement did include such value. A proposal by MacArthur's counsel on April 19, 2002 suggested a payment of $1.953 billion by USF&G, of which $167 million was ascribed to "Bad faith tort measures of liability." The settlement agreement signed seven weeks later was for $975 million (plus attorneys' fees)— almost exactly half the MacArthur demand. A factfinder might infer that this was a simple 50% settlement, and that therefore $83.5 million of it—a relatively small part of the total, but considerably more than zero—was attributable to the bad faith claims.

Fourthly, the parties to the settlement persuaded a bankruptcy court to approve a plan of reorganization based on the settlement, partly on the ground that the bad faith claims had

significant value. To obtain court approval, the proponents of the plan had to show, among other things, that the contribution of the debtors, Western Asbestos and MacArthur, to the settlement was "fair and equitable . . . in light of the benefits provided, or to be provided" on the debtors' behalf (11 USC § 524 [g] [4] [B] [ii]). The debtors claimed, and the Bankruptcy Court agreed, that the debtors' bad faith claims against USF&G, which they surrendered in the settlement, were part of the "benefits provided." The Bankruptcy Court found that the claims had "great settlement value"; it did not value them, but remarked that they were significant even if they "represent only ten percent of the settlement amount."

When the confirmation of the plan was appealed to the United States District Court, the debtors submitted a brief, joined by USF&G in relevant part, saying that the debtors' contributions included their "valuable rights of action for bad faith . . . against their insurers." The reinsurers do not argue, and we do not imply, that USF&G is estopped or otherwise barred from taking an inconsistent position now. But the position it did take, successfully, in the bankruptcy proceedings would be admissible against it on the issue of whether its allocation of nothing to the bad faith claims for reinsurance purposes was reasonable.

In short, we find it impossible to conclude, as a matter of law, that parties bargaining at arm's length, in a situation where reinsurance was absent, could reasonably have given no value to the bad faith claims. This issue must be decided at trial.

The Relative Valuation of Lung Cancer and Other Claims

There is, as we have explained, evidence from which a factfinder could conclude that the $200,000 value assigned by USF&G to the claims against MacArthur by claimants with lung cancer was unreasonably high (at 424). As our discussion above shows, a possible inference is that some of this value should properly have been attributed to the bad faith claims; but another possible inference is that claims falling below the reinsurers' $100,000 retention amount were undervalued. USF&G's allocation assigned values of $50,000, $20,000 and $20,000 to the claims of sufferers from asbestosis, pleural thickening and "other cancer," respectively. If some of the value attributed to the lung cancer claims were reassigned to these less serious claims, the result would be to decrease the reinsurers' liability. For example, if (to use values chosen arbitrarily) the lung cancer claims were reduced to $100,000 each, while the

values given the claims for the three other diseases were doubled, the result would be no reinsurance coverage for any claims in these four categories.

 Whether the values assigned to lung cancer, asbestosis, pleural thickening and other cancer claims could reasonably have been agreed on in arm's length bargaining in the absence of reinsurance presents an issue of fact.

The Allocation to the 1959 Policy

 The allocation of all of the losses encompassed in the settlement to a single insurance policy, the 1959 policy, was also to the advantage of USF&G and the disadvantage of the re-insurers. If the claims had been prorated over the many policy years in which claimants were exposed to asbestos, few if any losses would have exceeded the $100,000 retention in the re-insurance treaty, and thus the reinsurers would have largely or wholly escaped liability. We see no evidence, however, from which a factfinder could infer that this aspect of USF&G's allocation was unreasonable.

Courts have long struggled with the insurance coverage problems presented by injuries that, like those suffered by people exposed to asbestos, occur gradually, over a period of years in which several liability insurance policies are succes-sively in force. Rules to deal with such problems have been developed, and which policy or policies will apply often depends on which rules are invoked. Here, USF&G did its allocation on the assumption that California courts would follow the rules sometimes referred to as "continuous trigger," "all sums" and "no stacking."

The continuous trigger rule is that, when an injury is suf-fered continuously for a period in which several policies are ap-plicable, coverage under all of the policies is triggered (*see Mon-trose Chem. Corp. of Cal. v Admiral Ins. Co.*, 10 Cal 4th 645, 913 P2d 878 [1995]). The all sums rule is that all of the dam-ages from such an injury may be attributed to any policy that was in effect during the period in which the injury was suffered (*see Armstrong World Indus., Inc. v Aetna Cas. & Sur. Co.*, 45 Cal App 4th 1, 49-50, 52 Cal Rptr 2d 690, 705-707 [1996]). And no stacking means, in substance, that the claimant must pick one policy; he or she is not entitled to recover under every policy that could be triggered, thus adding or "stacking" the policy limits to produce a larger recovery (*see FMC Corp. v Plaisted & Cos.*, 61 Cal App 4th 1132, 1189-1191, 72 Cal Rptr 2d 467, 502-504 [1998]). Applied to this case, these rules mean that the

asbestos claimants could have chosen any one of the policies that USF&G issued to Western Asbestos, and attributed all their injuries to that policy. It is not disputed that, given that choice, they would have picked the 1959 policy, for there is no policy with higher policy limits, and all claimants who were exposed to asbestos in 1959 or earlier could claim to have suffered some injury in that year.

The reinsurers complain of USF&G's adoption of all three of these rules for allocation purposes. As to all sums and no stacking we find their objections plainly lacking in merit. At least the *Armstrong World Indus.* case clearly held that the all sums approach was accepted in California, and the reinsurers cite no authority contrary to that decision. And we do not understand how the reinsurers can complain of the no stacking rule, which significantly limited both USF&G's and the reinsurers' total obligation. Indeed, in light of the California Supreme Court's recent approval of stacking (*see State of California v Continental Ins. Co.*, 55 Cal 4th 186, 281 P3d 1000 [2012] [overruling the *FMC* case]), it seems that the reinsurers were lucky that the settlement occurred while the no stacking rule was still viable in California.

The application of the continuous trigger rule requires more discussion. The California Supreme Court held in *Montrose* that that rule applied to policies obligating the insurer to pay damages "caused by an occurrence," where "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions" (10 Cal 4th at 656, 913 P2d at 881). The reasoning of the *Montrose* court is tied to the precise wording of the policies (*see* 10 Cal 4th at 669-689, 913 P2d at 890-904). The policies USF&G issued to Western Asbestos, which were on a form older than the one at issue in *Montrose*, insured against liability for injuries caused by "accident," but "accident" was not defined, and the policies made no reference to "continuous or repeated exposure." It could be argued—and USF&G did argue, during the negotiations for settlement of the coverage litigation—that these older, "accident-based" policies did not permit application of the continuous trigger rule. Indeed, a California case decided after USF&G settled the coverage litigation, *Lockheed Corp. v Continental Ins. Co.* (134 Cal App 4th 187, 208, 35 Cal Rptr 3d 799, 814 [2005]), rejected the continuous trigger rule; that case involved another older form of policy, which the court described as "accident-based."

It was not unreasonable to believe in 2002, however, that USF&G's attempt to distinguish "occurrence-based" from

"accident-based" policies would not succeed. Before the *Lockheed* decision, the distinction was by no means so well established as the reinsurers now claim (*see Aerojet-General Corp. v Transport Indem. Co.*, 17 Cal 4th 38, 56 n 9, 948 P2d 909, 919 n 9 [1997] ["As pertinent here, the difference in words (between 'accident' and 'occurrence' policies) does not reflect any difference in substance"]). The Third Circuit had said, in 1991, that the insurance industry's transition from accident-based to occurrence-based coverage in the 1960s was merely a recognition of what was already "prevailing case law" (*New Castle County v Hartford Acc. & Indem. Co.*, 933 F2d 1162, 1196 [3d Cir 1991]). The *New Castle* court remarked that a narrow definition of "accident" which would not include gradual damage had been "roundly rejected by the judiciary" (*id.*). We see no basis for concluding that it would have been unreasonable for parties bargaining at arm's length in the absence of reinsurance to expect, in 2002, that the California courts would reject a similar argument.

The reinsurers also argue that the "Other Insurance" clause of the policies USF&G issued to Western Asbestos forbade the allocation of all losses to one policy year. That clause says:

> "If the Insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

The reinsurers' argument is that each of USF&G's policies in force during any of the years at issue here was "other insurance" with respect to the other policies, and so must bear a pro rata share of each loss. The argument is without merit. It was and is at least reasonable to read the clause as applicable to policies issued by other insurers, not to policies of the same insurer covering other time periods (*see Dart Indus., Inc. v Commercial Union Ins. Co.*, 28 Cal 4th 1059, 1078-1080, 52 P3d 79, 92-93 [2002]). The reinsurers cite no authority in support of their reading.

As to the allocation of all losses to the 1959 policy year, summary judgment in USF&G's favor was properly granted.

## IV

■ In addition to challenging USF&G's allocation, the reinsurers argue in the alternative that they have no liability to

USF&G because the applicable reinsurance treaty was retroactively amended to increase the retention per loss to $3,000,000, far more than any loss for which USF&G could have been liable. We find the evidence of this alleged amendment insufficient to raise an issue of fact.

There is no evidence of any written endorsement or amendment to alter the retention on the treaty in issue here, though such endorsements exist for later treaties, covering the years 1962 and afterwards. The suggestion that an agreement of such importance between such sophisticated parties would be orally amended, without any writing being issued for the purpose of confirming the amendment, is a highly unlikely one. The reinsurers rely on evidence showing at most that certain representatives of the parties thought that they would agree, or mistakenly thought that they had agreed, to increase the retention for years preceding 1962. The proof offered by USF&G that no such increase was ever finally agreed to stands without any refutation of substance.

. . .

The reinsurers' other arguments are without merit.

Accordingly, the order of the Appellate Division should be modified, without costs, to grant USF&G's motion for summary judgment in part and to deny it in part in accordance with this opinion, and as so modified affirmed, and the certified question should not be answered on the ground that it is unnecessary.

Chief Judge LIPPMAN and Judges GRAFFEO, READ and PIGOTT concur.

Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed, and certified question not answered upon the ground that it is unnecessary.