[7 NYS3d 38]

NEW HAMPSHIRE INSURANCE COMPANY, Appellant-Respondent, v
CLEARWATER INSURANCE COMPANY, Respondent-Appellant.

First Department, March 24, 2015

### APPEARANCES OF COUNSEL

*Sidley Austin LLP*, New York City (*William M. Sneed* of the bar of the State of Illinois, admitted pro hac vice, and *Alan J. Sorkowitz* of counsel), for appellant-respondent.

*Crowell & Moring LLP*, New York City (*Harry P. Cohen* and *Brian J. O'Sullivan* of counsel), for respondent-appellant.

### OPINION OF THE COURT

Friedman, J.

Plaintiff New Hampshire Insurance Company (New Hampshire) has settled, along with several affiliated liability insurers under common corporate control (collectively, AIG), hundreds of millions of dollars of claims—most but not all of which are asbestos-related personal injury claims—with nonparty Kaiser Aluminum & Chemical Corporation (Kaiser), a common insured of the settling carriers. AIG's settlement agreement with Kaiser does not address the allocation of losses to particular claims, policies or carriers beyond providing that AIG may effect such an allocation "for its own purposes, in its own books and records," which AIG has done. That allocation ascribes 100% of the settlement amount to asbestos product liability claims within the coverage of Kaiser's New Hampshire excess policy (issued for the period from June 1973 to June 1976) and none of the amount to other settled claims—for bad faith, defense costs in addition to policy limits, and premises liability—that Kaiser had asserted against certain other AIG carriers, but not against New Hampshire.

New Hampshire has brought this action against defendant Clearwater Insurance Company (Clearwater), a reinsurer of

the excess policy New Hampshire issued to Kaiser, seeking to require Clearwater to indemnify New Hampshire for the share prescribed by its reinsurance certificate of the portion of the Kaiser settlement payments (which are being made over a 10-year period) that AIG has allocated to the New Hampshire policy. In its defense, Clearwater challenges AIG's allocation of 100% of the settled losses to asbestos products liability claims, contending that this allocation unreasonably results in the reinsured New Hampshire policy bearing part of the cost of settling the premises, bad faith and defense cost claims that Kaiser had not asserted against New Hampshire or that were not covered by the New Hampshire policy. Clearwater also asserts, as additional affirmative defenses, that New Hampshire (known as the ceding company, or "cedent," in reinsurance nomenclature; see *United States Fid. & Guar. Co. v American Re-Ins. Co.*, 20 NY3d 407, 418 [2013] [hereinafter *USF&G*]) has breached its contractual notice, reporting and risk retention obligations under the terms of the reinsurance certificate.

█ While discovery was in its early stages, and before any witnesses had been deposed, New Hampshire moved for summary judgment in its favor. Concerning the allocation issue, New Hampshire argued that Clearwater, as a reinsurer, was bound, as a matter of law, by New Hampshire's allocation of settled claims to the reinsured policy under general principles of the law of reinsurance. We agree with Supreme Court that this argument is unavailing. As more fully discussed below, even if the subject reinsurance certificate, in spite of its lack of a clause expressly so providing, generally obligates Clearwater to "follow the settlements" made by New Hampshire with its insured—a question that we need not, and do not, decide on this appeal—the cedent's allocation decisions are not "immune from scrutiny" (*USF&G*, 20 NY3d at 420). In particular, even where the "follow the settlements" doctrine applies, the reasonableness of a cedent's decision not to attribute any portion of a settlement to settled claims that were not covered by the reinsured policy may, on a proper record, present an issue of fact (*see id.* at 414, 422-425 [finding that the reasonableness of the cedent's attribution of none of the settlement amount to the insured's bad faith claims, which were not covered by reinsurance, presented a triable issue]). Accordingly, given the undeveloped factual record of this case, Supreme Court properly denied New Hampshire summary judgment on the allocation issue (2013 NY Slip Op 32812[U] [2013]). However,

also in view of the undeveloped state of the record, the court erred in granting New Hampshire summary judgment dismissing Clearwater's affirmative defenses alleging that New Hampshire breached its notice, reporting and risk retention obligations under the reinsurance certificate. We therefore modify the order under review to deny New Hampshire's summary judgment motion in its entirety.

## Factual and Procedural Background

### The Subject Insurance Policy

The underlying insurance policy at issue in this dispute was issued by New Hampshire to Kaiser in 1973 and covered the three-year period from June 6, 1973 to June 6, 1976. The policy, designated as policy number 5173-0230 (hereinafter, the NH-Kaiser policy), afforded Kaiser high-level excess liability coverage, with an annual per-occurrence limit of $50 million and an annual aggregate limit of liability of $50 million for products liability losses. The NH-Kaiser policy attached in excess of specified underlying umbrella policies with an annual per-occurrence limit of $50 million and an aggregate annual limit of $50 million for products liability losses. Thus, the NH-Kaiser policy was not implicated until Kaiser's covered losses for a given year during the policy period exceeded $50 million.

Although the NH-Kaiser policy apparently was the only one that New Hampshire issued to Kaiser, the record reflects that six other AIG-affiliated carriers issued Kaiser a total of 48 excess liability policies, at various levels of coverage, during the period from 1970 to 1985. The aggregate limits of Kaiser's 49 AIG policies (including the NH-Kaiser policy) totaled approximately $575 million.

### The Subject Reinsurance Contract

New Hampshire ceded a portion of its risk under the NH-Kaiser policy to Clearwater (which was then known as Skandia) pursuant to a contract entitled "Casualty Facultative Reinsurance Certificate No. 0567," dated July 10, 1973 (hereinafter, the Clearwater-NH certificate).[1] The Clearwater-NH certificate originally provided that Clearwater would indemnify New

---

1.  As the *Court of Appeals* has explained:

    "Reinsurance comes primarily in two forms: facultative and treaty reinsurance. Facultative reinsurance is policy-specific, meaning that all or a portion of a reinsured's risk under a specific contract of direct coverage will be indemnified by the reinsurer in the event of loss. In contrast, a carrier seeking to

Hampshire for a 4% pro rata share (up to $2 million per year) of any liability under the NH-Kaiser policy. In 1974, an amendment to the Clearwater-NH certificate increased Clearwater's pro rata share of New Hampshire's liability under the NH-Kaiser policy to 8%, or up to $4 million per year.

The Clearwater-NH certificate provides that Clearwater's "liability . . . shall follow [New Hampshire's] liability in accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate." It also contains a provision under which New Hampshire "warrants that it shall retain for its own account, subject to treaty reinsurance only, if any, the amount specified on the face of this Certificate." New Hampshire further agreed that it would "notify [Clearwater] promptly of any event or development which [New Hampshire] reasonably believes might result in a claim against [Clearwater]" and would "forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim" under the certificate. The Clearwater-NH certificate also gives Clearwater the right to associate with New Hampshire in the defense of any claim made against the reinsured policy.

The Claims against Kaiser and Ensuing Coverage Litigation

Kaiser was first named as a defendant in asbestos-related personal injury actions in the late 1970s. Eventually, the asbestos-related claims against Kaiser numbered in the hundreds of thousands. The asbestos claims arose from Kaiser's sale of asbestos-containing products or from alleged asbestos exposure at Kaiser's manufacturing premises. Also relevant to this action are personal injury claims against Kaiser arising from alleged exposure to substances and conditions other than asbestos (including benzene, volatile coal tar pitch, and excessive noise) at Kaiser's manufacturing premises. The accumulation of these claims forced Kaiser into chapter 11 bankruptcy proceedings in 2002.

In 2000, Kaiser commenced a declaratory judgment action in California state court (the asbestos products action) against

reduce potential financial losses from policies issued to a class of customers or an industry may purchase treaty reinsurance" (*Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583, 587 [2001]).
Facultative reinsurance is the form of reinsurance at issue in this case.

certain of its insurers to resolve disputes over coverage for the asbestos products liability claims against it (asbestos products claims). Although New Hampshire was not originally named as a defendant in this action, it was impleaded by other insurers, and Kaiser amended its complaint in 2001 to name all of its insurers, including New Hampshire, as defendants. In the asbestos products action, Kaiser asserted, in addition to its claims for declaratory relief and breach of contract, claims for bad faith against certain insurers, including two AIG carriers, Lexington Insurance Company (Lexington) and Insurance Company of the State of Pennsylvania (ICOP), but not New Hampshire. Also, the court in the asbestos products action ruled that Kaiser's ICOP policy obligated the insurer to pay Kaiser's defense costs in addition to the limits of its policy (defense costs claims).

In 2001, Kaiser commenced a separate declaratory judgment action in California state court (the premises action) against certain of its insurers concerning coverage for personal injury claims based on exposure to substances or conditions at Kaiser's manufacturing premises (premises claims), including claims for workplace exposure to asbestos, silica, coal tar pitch volatiles, and benzene, and claims for noise-induced hearing loss. Lexington was the only AIG carrier named as a defendant in the premises action.

The Kaiser Settlement

In 2006, Kaiser's total unliquidated liability for personal injury claims of all kinds was estimated to be as high as $2.5 billion, while the aggregate limits of its remaining solvent insurance coverage then totaled approximately $1.5 billion. The remaining aggregate limits of Kaiser's coverage from the AIG carriers were then approximately $568 million.

In April 2006, Kaiser and the AIG carriers, including New Hampshire, resolved their coverage disputes by entering into a settlement agreement (the Kaiser settlement), which was approved by the bankruptcy court on May 9, 2006, and went into effect upon Kaiser's emergence from bankruptcy on September 16, 2006. The Kaiser settlement essentially requires Kaiser's seven AIG carriers, collectively, to pay a trust that had been created to liquidate claims against Kaiser up to the full amount of the AIG carriers' aggregate remaining policy limits as of 2006—approximately $568 million—on a quarterly basis over a

period of 10 years.[2] In exchange, the AIG carriers received a full release of all claims under, or relating to, the policies issued to Kaiser, including: (1) asbestos products claims; (2) premises claims, whether for exposure to asbestos, silica, coal tar pitch volatiles, or benzene, or for noise-induced hearing loss; (3) the bad faith claims that had been asserted against Lexington and ICOP; and (4) the defense costs claims that had been asserted against ICOP.

As previously noted, the Kaiser settlement does not allocate the settlement amount to particular claims, policies or carriers. Rather, the Kaiser settlement provides that the "AIG Member Companies shall have the right to allocate the Settlement Amount, or any portions thereof, solely for its [sic] own purposes, in its own books and records, to the various types and classifications of claims under the Subject Policies released by [Kaiser]." AIG chose to allocate 100% of the settlements to asbestos products claims and 0% of the settlement payments to any of the other kinds of claims—including premises claims, bad faith claims and defense costs claims—that had been released. The settlement payments were allocated to policies using "a ground-up, rising bathtub approach" (as described in the record by New Hampshire's administrator), under which

> "payments [are] allocated on the basis of horizontal exhaustion, which means losses are allocated to the lowest layer of coverage first and, like a bathtub, fill from the bottom layer up. Under that approach, a given layer of coverage is not implicated until the layer beneath it is completely exhausted" (*North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d 134, 138 n 6 [2d Cir 2004]).

The Instant Action

Pursuant to AIG's "bathtub" methodology, AIG projected, when it began making payments under the Kaiser settlement in 2006, that it would begin allocating payments to the NH-Kaiser policy in 2011. When AIG began billing Clearwater for its 8% share of the settlement payments allocated to the NH-

---

**2.** The amount of each quarterly payment under the Kaiser settlement is 37.5% of the sum of the value of the claims liquidated during that quarter by Kaiser's claim-liquidating trust and the trust's expenses for that quarter, subject to specified caps. Rollover provisions apply to the extent the specified percentage of the sum of the liquidation values and costs for a given quarter is greater or less than the cap. We note that 37.5% appears to approximate AIG's share of the solvent insurance available to Kaiser at the time the Kaiser settlement was agreed upon ($568 million/$1.5 billion).

Kaiser policy, Clearwater declined to pay, leading to this lawsuit, which New Hampshire commenced in December 2011.[3] In its answer, Clearwater asserted as its second and third affirmative defenses, respectively, that New Hampshire had failed to comply with its reporting and notice requirements under the Clearwater-NH certificate, and, as its seventh affirmative defense, that New Hampshire had "breached the retention warranty in the Facultative Certificate."

In February 2013, New Hampshire moved for summary judgment in its favor, thereby staying disclosure pursuant to CPLR 3214 (b). At that time, although the parties had begun to exchange documents, discovery was "in its infancy," as Supreme Court recognized in its decision. No witnesses had been deposed, and there was pending before the court an undecided motion by Clearwater to compel production of about 18,000 pages of documents (which New Hampshire had agreed to produce but was withholding pending entry of an agreed-upon protective order) concerning New Hampshire's "assessment of the coverage litigation" and Kaiser's "assessment of the asbestos bodily injury litigation." In addition, when New Hampshire moved for summary judgment, it had not yet produced documents in response to Clearwater's December 2012 supplemental document request for, inter alia, documents "concerning New Hampshire's retention under [the Clearwater-NH certificate]."

In the order appealed from, Supreme Court granted New Hampshire's motion only to the extent of dismissing Clearwater's second, third and seventh affirmative defenses, and otherwise denied the motion. New Hampshire has appealed and Clearwater has cross-appealed, each party challenging the portion of Supreme Court's order by which it is aggrieved. For

---

3. It appears from the record that, notwithstanding the 2006 projection that settlement payments would reach New Hampshire's level of coverage in 2011, AIG began billing Clearwater under the Clearwater-NH certificate (identifying the insurance policy and reinsurance certificate by numbers, but without reference to New Hampshire by name) in 2010. The parties have not explained this discrepancy to us. We note that, in 2010, an earlier action was commenced in Supreme Court, New York County, in connection with this dispute, under the caption *Insurance Co. of State of Pa. v Clearwater Ins. Co.* (index No. 652424/10), which action, the parties agree, was "resolved by an agreement dated May 27, 2011," which does not appear in the record and has not been described to us. In any event, we need not resolve the discrepancy between the 2006 projection and the apparent date of the first billing under the Clearwater-NH certificate to decide this appeal.

the reasons, discussed below, we modify to deny New Hampshire's summary judgment motion in its entirety.[4]

## Discussion

We turn first to the question, raised by New Hampshire's appeal, of whether, contrary to Supreme Court's determination, New Hampshire was entitled to summary judgment holding Clearwater, as reinsurer of the NH-Kaiser policy, bound by New Hampshire's allocation to the NH-Kaiser policy of amounts paid under the Kaiser settlement. Again, the Kaiser settlement left entirely to the discretion of AIG (of which New Hampshire is a subsidiary) the allocation of the losses paid pursuant to the settlement among Kaiser's various AIG carriers and policies, "solely for [AIG's] own purposes, in its own books and records." In its exercise of that prerogative, AIG has allocated all amounts paid under the Kaiser settlement to asbestos products claims for which Kaiser had sought coverage under the NH-Kaiser policy and none to other settled claims (premises claims, bad faith claims, and defense costs claims) that Kaiser had not raised against New Hampshire before settling. As previously noted, although our reasoning differs in certain respects from that of Supreme Court, we affirm the denial of summary judgment to New Hampshire on this issue.

In addressing the allocation issue, Supreme Court first held that Clearwater is collaterally estopped to deny that the Clearwater-NH certificate imposes on it, as reinsurer, a duty to "follow the settlements" made by New Hampshire, its cedent, with New Hampshire's insured. At this point, an explanation of the "follow the settlements" doctrine is in order.[5] Where it applies, the "follow the settlements" doctrine "ordinarily bars

---

**4.** Supreme Court's reasoning and additional pertinent facts are set forth in the course of our discussion of the legal issues, which follows.

**5.** The "follow the settlements" doctrine is sometimes referred to as "follow the fortunes." Here, we follow the Court of Appeals' most recent decision on this subject in using the term "follow the settlements" (*see USF&G*, 20 NY3d at 418). We note that some scholars take the position that these two phrases refer to two different and distinct doctrines. Under this view, "following the fortunes" refers to the duty of a treaty reinsurer (which, unlike a facultative reinsurer, agrees to reinsure policies to be issued in the future) to accept the cedent's underwriting judgments, while "following the settlements" refers to the duty of a reinsurer (whether facultative or treaty) to defer to the cedent's settlement determinations (*see* Graydon S. Staring & Dean Hansell, Law of Reinsurance §§ 2:10, 18:1 [2014] [hereinafter Staring]; *Reinsurance: Indemnifying Insurers for Insurance Losses*, Reinsurance at 26 [Robert W. Strain rev ed 1997] [hereinafter Strain] ["there is a historical basis for the view that following fortunes focuses more on underwriting and

challenge by a reinsurer to the decision of [the cedent] to settle a case for a particular amount" (*USF&G*, 20 NY3d at 418). Specifically, under this doctrine,

> "a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. A reinsurer cannot second guess the good faith liability determinations made by its reinsured . . . . The rationale behind this doctrine is two-fold: first, it meets the goal of maximizing coverage and settlement and second, it streamlines the reimbursement process and reduces litigation" (*Travelers*, 96 NY2d at 596 [citation and internal quotation marks omitted]).

Stated otherwise, as "an exception to the general rule that contract interpretation is subject to de novo review" (*North Riv. Ins. Co. v CIGNA Reins. Co.*, 52 F3d 1194, 1206 [3d Cir 1995]), the "follow the settlements" doctrine "insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are clearly beyond the scope of the original policy or in excess of the reinsurer's agreed-to exposure" (*Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113, 121 [1st Dept 2007], *lv denied* 10 NY3d 711 [2008] [internal quotation marks and brackets omitted]; *see also North Riv. Ins. Co. v Ace Am. Reins. Co.*, 361 F3d at 141 [noting that "the typical follow-the-settlements requirements" are that the settlement be "in good faith, reasonable, and within the applicable policies"]; *National Union Fire Ins. Co. of Pittsburgh, Pa. v American Re-Ins. Co.*, 441 F Supp 2d 646, 650-651 [SD NY 2006] [a reinsurer must indemnify the cedent for a settlement if the claim is "at least arguably within the scope of the insurance coverage that was reinsured" (internal quotation marks omitted)]; Staring § 18:9;

---

actual coverage of the reinsured, and following settlements focuses more on the reinsured's process of settling the claims of its insured"]). Under the view that each phrase refers to a different doctrine, "following the settlements" is the doctrine relevant to this case. It has been noted that, nonetheless, "the vast majority of case law and commentators use the two terms interchangeably to refer to what is actually the 'follow the settlements' doctrine" (John S. Diaconis & Douglas W. Hammond, Reinsurance Law § 3:2 n 3 [2014] [hereinafter Diaconis]; *see also USF&G*, 20 NY3d at 418; Barry R. Ostrager & Mary Kay Vyskocil, Modern Reinsurance Law and Practice § 9:01 [a] at 217 [3d ed 2014] [hereinafter Ostrager]). Accordingly, although some of the decisions cited below use the phrase "follow the fortunes," it is clear from the context that the courts are discussing the reinsurer's obligation to defer to the cedent's reasonable, good faith settlements.

Ostrager §§ 9:01 [a], [c]; 9:03 [a], [b] [2]; [c]; Diaconis § 3:2; Strain at 27 [under the "following the settlements" doctrine, the reinsurer "can . . . contest the claim only by showing that the settlement was manifestly outside the coverage or in bad faith or the result of negligent and unbusinesslike practice"]).

The basis for Supreme Court's collateral estoppel finding against Clearwater on the question of whether it had a duty to "follow the settlements" was a Massachusetts state trial court decision captioned *Lexington Ins. Co. v Clearwater Ins. Co.* (28 Mass L Rptr 519, 2011 WL 3715546, 2011 Mass Super LEXIS 127 [2011]). *Lexington* construed a provision of a reinsurance certificate issued by Clearwater (when known as Skandia) to another AIG carrier (Lexington) as a "follow the settlements" clause.[6] The Clearwater-NH certificate contains a provision substantially identical to the certificate provision at issue in *Lexington*, and Supreme Court held that this sufficed to collaterally estop Clearwater from relitigating the meaning of the relevant contractual language.

In view of its finding that Clearwater has a duty under the Clearwater-NH certificate to "follow the settlements," Supreme Court held that New Hampshire's decisions concerning the allocation of settlement payments among its policies are entitled to "deference" (2013 NY Slip Op 32812, *6, citing *USF&G*, 20 NY3d at 419). Nonetheless, recognizing that, even under the "follow the settlements" doctrine, "a cedent's allocation decisions . . . are not immune from scrutiny" (*id.*, citing *USF&G* at 420), the court denied New Hampshire summary judgment on the ground that the existing record raises a triable issue concerning the reasonableness of New Hampshire's allocation. In this regard, the court noted that discovery had still been "in its infancy" when stayed by New Hampshire's summary judgment motion.

■ Initially, contrary to Supreme Court's view, the Massachusetts decision does not give rise to collateral estoppel barring Clearwater from denying that a duty to "follow the settlements" arises from the same language in the Clearwater-NH certificate. "[T]he doctrine of collateral estoppel does not operate to bar relitigation of a pure question of law" (*Sterling Natl. Bank v Eastern Shipping Worldwide, Inc.*, 35 AD3d 222, 223 [1st Dept 2006], citing *American Home Assur. Co. v Interna-*

---

**6.** The insured under the policy reinsured by the certificate at issue in *Lexington* was a company known as Dresser Industries, not Kaiser.

*tional Ins. Co.*, 90 NY2d 433 [1997]). The interpretation of an unambiguous contract is a question of law for the court (*Sterling Natl. Bank*, 35 AD3d at 223; *Taussig v Clipper Group, L.P.*, 13 AD3d 166, 167 [1st Dept 2004], *lv denied* 4 NY3d 707 [2005]), as is the determination of whether contractual language is ambiguous (*see Kass v Kass*, 91 NY2d 554, 566 [1998]; *Banco Espírito Santo, S.A. v Concessionária Do Rodoanel Oeste S.A.*, 100 AD3d 100, 107 [1st Dept 2012]). Accordingly, the Massachusetts court's construction of the relevant language of the reinsurance certificate in that case is not binding on Clearwater in this action concerning a different certificate issued to a different cedent with respect to an underlying policy covering a different insured.

The language of the Clearwater-NH certificate that Supreme Court, following *Lexington*, construed as a "follow the settlements" clause is as follows (with references to "Skandia" replaced by references to "Clearwater"):

> "1. [CLEARWATER'S] LIABILITY: [Clearwater's] liability under this Casualty Facultative Reinsurance Certificate ('Certificate') shall follow the ceding Company's ('Company') liability in accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate."

■ We respectfully disagree with the view of the *Lexington* court (which Supreme Court incorrectly believed to be binding on Clearwater in this action) that the above-quoted paragraph 1 of the Clearwater-NH certificate constitutes a "follow the settlements" clause. The provision contains no reference to the cedent's voluntary handling of claims—absent are the words "settlement," "compromise," "payment," "allowance," and "adjustment," as well as any permutations of the foregoing and any words to similar effect. This contrasts with "follow the settlements" clauses, which, as one would expect, employ language referring in some way to the cedent's claims-handling decisions (*see e.g. USF&G*, 20 NY3d at 418 ["follow the settlements" clause provided: " 'All claims in which this reinsurance is involved, *when allowed by the (cedent)*, shall be binding upon the Reinsurers, which shall be bound to pay or allow, as the case may be, their proportion of such loss' " (emphasis added)]; *Excess Ins. Co. Ltd. v Factory Mut. Ins. Co.*, 3 NY3d 577, 580 [2004] ["follow the settlements" clause provided: " 'Reinsurers

agree to follow *the settlements of the Reassured* in all respects' " (emphasis added)]; Staring § 18:6 [giving examples of language used in "follow the settlements" clauses]). No such provision appears in the Clearwater-NH certificate.

Rather than a "follow the settlements" clause, paragraph 1 of the Clearwater-NH certificate constitutes a "following form" clause. The purpose of a "following form" clause is "to achieve concurrency between the reinsured contract and the policy of reinsurance, thereby assuring the ceding company, that by purchasing reinsurance, it has covered the same risks by reinsurance that it has undertaken on behalf of the original insured under its own policy" (*Aetna Cas. & Sur. Co. v Home Ins. Co.*, 882 F Supp 1328, 1345 [SD NY, 1995]). Accordingly, "[a] 'following form' clause in a policy of reinsurance incorporates by reference all the terms and conditions of the reinsured policy, except to the extent that the reinsurance contract by its own terms specifically defines the scope of coverage differently" (*id.*, quoted in Staring § 12:5). This is precisely the effect of paragraph 1 of the Clearwater-NH certificate, which, to reiterate, provides that "[Clearwater's] liability . . . shall follow [New Hampshire's] liability in accordance with the terms and conditions of the policy reinsured hereunder" (*see e.g. Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.*, 4 F3d 1049, 1055 [2d Cir 1993] [identifying as a "Follow the Form Clause" a provision in a reinsurance certificate to the effect that the reinsurer's liability " 'shall follow that of (the cedent) and, except as otherwise provided by this Certificate, shall be subject in all respects to all the terms and conditions of (the cedent's) policy' "]). The authors of one treatise on reinsurance law caution that "a 'follow the form' clause should not be confused with a 'follow the fortunes' clause or a 'follow the settlements' clause" (Ostrager § 2:03 [a] at 73).

██ The absence from the Clearwater-NH certificate of a "follow the settlements" clause raises the question of whether a duty of the reinsurer to "follow the settlements" may be implied in a reinsurance contract that lacks such a provision. This question, which apparently has not yet been addressed by a New York state appellate court, has received different answers from the courts of other jurisdictions that have addressed it, and "[t]here is no judicial consensus on this issue" (7 Business

and Commercial Litigation in Federal Courts § 80:16 [3d ed]).[7] We need not resolve this question to decide this appeal, since, even if Clearwater is obligated to "follow the settlements," the reasonableness of New Hampshire's allocation to the NH-Kaiser policy of payments under the Kaiser settlement cannot be determined as a matter of law on this record, as Supreme Court correctly concluded.[8]

In *USF&G*, the Court of Appeals observed that "to say that a cedent's allocation decisions are entitled to deference [under the 'follow the settlements' doctrine] is not to say that they are immune from scrutiny" (20 NY3d at 420). The Court went on to hold that "objective reasonableness should ordinarily determine the validity of an allocation" (*id.*), meaning that "[t]he reinsured's allocation must be one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist" (*id.*). Applying this standard to the facts of *USF&G*, the Court held that a triable issue existed as to the reasonableness of the cedent's decision to allocate none of the subject settlement to the insured's claims against it for bad faith refusal to defend, to which reinsurance was not applicable (*id.* at 422-425). The Court reached this conclusion based on evidence in the record from which "it could be found that [the cedent] faced a significant risk of an adverse verdict on the bad faith claims" (*id.* at 422) and from which "it could be

---

7. The case law addressing whether the "follow the settlements" doctrine may be implied in a contract for reinsurance in the absence of an express contractual provision to that effect is collected in David J. Marchitelli, Annotation, *Application of Follow the Fortunes Doctrine, Imposing Legal Duty on Reinsurer to Pay its Share of Settlement Made by Reinsured with Original Parties*, 85 ALR6th 531, §§ 4-7 (*see also* Ostrager § 9:01 [b] at 221-224; Diaconis § 3:3; 7 New Appleman on Insurance Law Library Edition § 74.02 [3] [2014]). We note that certain scholars in the field have argued that, in the absence of a contractual provision expressly incorporating it, the "follow the settlements" doctrine should not be implied in a contract of reinsurance (*see* Staring §§ 18:2, 20:6 ["In the absence of a following settlements clause, . . . the reinsured has the burden of proving that the loss was specifically caused by a risk covered in the reinsurance contract"]; Strain at 26 ["Without any special provision in the agreement, the reinsured who voluntarily settles a claim . . . would have to present evidence to its reinsurer that the claim was covered by its direct policy" and, "(i)f the claim were disputed and compromised, . . . that the compromise was beneficial and the amount reasonable"]; William Hoffman, *On the Use and Abuse of Custom and Usage in Reinsurance Contracts*, 33 Tort & Ins L J 1, 60-71 [1997]).

8. Since Clearwater does not seek summary judgment in its favor, we need not consider whether the record establishes as a matter of law that the allocation was unreasonable or otherwise not binding on Clearwater.

found that [the cedent], in allocating the settlement, assigned inflated values to claims other than the bad faith claims—i.e., to claims that were covered in part by reinsurance" (*id.* at 424). The Court also found that there was "evidence from which a factfinder could conclude that the $200,000 value assigned by [the cedent] to the claims . . . by claimants with lung cancer was unreasonably high," possibly resulting in less serious "claims falling below the reinsurers' $100,000 retention amount [being] undervalued" (*id.* at 425), which would have had the effect of increasing the reinsurers' ultimate liability.

Aside from the fact that *USF&G* was decided on a much more fully developed record than exists here, the allocation issue in the instant case largely parallels the allocation issue in *USF&G*. Clearwater, the reinsurer, challenges the decision of New Hampshire, the cedent—a decision that New Hampshire made unilaterally, without the insured's participation, under the terms of the Kaiser settlement—to allocate 100% of the payments made under the settlement to asbestos products claims covered by the NH-Kaiser policy, and none of those payments to other categories of claims (premises claims, bad faith claims, and defense cost claims) that, although released in the settlement, Kaiser had asserted only against other AIG carriers, not New Hampshire, before the settlement was made. On this undeveloped record, we have no way of telling whether or not it was reasonable to allocate no portion of the settlement to claims that were not asserted against New Hampshire or were not even covered by its policy. It may be that the allocation could be justified on the ground that the claims given no allocation were highly unlikely to prevail, or so small in value relative to the asbestos products claims as to be immaterial, but we simply have no basis to make such a determination on this record.[9] As Supreme Court observed, "New Hampshire has failed to come forth with affidavit proof sufficient to establish that the allocation of the settlement did not unduly burden Clearwater with amounts attributable to policies of other AIG carriers." (2013 NY Slip Op 32812, *7.) Further, even if New

---

9. The cases on which New Hampshire relies in arguing that it is entitled to summary judgment on the allocation issue are generally inapposite in that they were decided on fully developed evidentiary records and, in some cases, after trial. Nor do the cases cited by New Hampshire—aside from *USF&G*, which actually supports Clearwater's position—deal with a cedent's determination to allocate 100% of a settlement to a single category of claims covered by the reinsurer and 0% to other categories of claims that were released by the settlement but would not have implicated the reinsurance.

Hampshire had submitted admissible evidence sufficient to make out a prima facie case as to allocation (which it did not), Supreme Court correctly recognized that, as of the time New Hampshire moved, Clearwater had not had an adequate opportunity to explore the justification of the allocation through discovery. Accordingly, even assuming that Clearwater has a duty to "follow the settlements" under the Clearwater-NH certificate, the denial of the portion of New Hampshire's summary judgment motion addressed to the allocation issue was correct.[10]

New Hampshire argues that, in denying it summary judgment on the allocation issue, Supreme Court unjustifiably disregarded copious case law approving New Hampshire's "bathtub" method of claims allocation as "reinsurance-blind and reinsurance-neutral." As Supreme Court correctly recognized, however, this argument misconceives the nature of Clearwater's objection to the allocation. The point was aptly expressed by Supreme Court as follows: "Clearwater does not dispute the bathtub method of allocation, but rather the nature of the claims to which the settlement was allocated." (*Id.*) We also agree with Clearwater's restatement of the same point: "[T]he question is not what methodology AIG uses to fill its bathtub, but, rather, what AIG is *pouring into* its bathtub as an initial matter."

Since the record does not establish that the allocation of the Kaiser settlement passes muster even under the forgiving standard that applies under the "follow the settlements" doctrine, it follows that New Hampshire is not entitled to summary judgment on the allocation issue in the event the "follow the settlements" doctrine is ultimately held not to apply. New Hampshire does not argue that it has established, on the present record, that the allocation of the Kaiser settlement resulted in New Hampshire paying only for claims that were actually covered

---

**10.** In denying New Hampshire summary judgment on the allocation issue, Supreme Court placed considerable weight on an internal AIG memorandum requesting authority to enter into the Kaiser settlement. The court found significant the memorandum's highlighting of two benefits to AIG of the contemplated settlement: (1) the release of premises claims that, "if not resolved, would not be subject to aggregate limits"; and (2) the resolution of claims for defense costs in addition to limits under certain policies other than the NH-Kaiser policy, which "avoids payment of additional defense costs by treating all policies as ultimate net loss policies." In our view, since New Hampshire did not even make out a prima facie case for judgment in its favor on the issue of the reasonableness of the allocation, it is not necessary to consider this memorandum to affirm the denial of summary judgment.

by the NH-Kaiser policy, which is the standard New Hampshire would have to meet if the "follow the settlements" doctrine does not apply. As previously stated, we leave the issues of whether the "follow the settlements" doctrine applies—and, if not, whether it is possible for New Hampshire to prevail in this action—to be resolved in future proceedings.

We now turn to Clearwater's cross appeal, which challenges Supreme Court's order insofar as it granted New Hampshire summary judgment dismissing Clearwater's second and third affirmative defenses, based on New Hampshire's alleged failure to meet the reporting and notice requirements under the Clearwater-NH certificate, and Clearwater's seventh affirmative defense, alleging that New Hampshire failed to abide by its $2 million retention warranty under the Clearwater-NH certificate. For the reasons discussed below, we hold that Supreme Court erred in granting New Hampshire summary judgment dismissing these defenses.

■ Clearwater's affirmative defenses alleging that New Hampshire did not meet the loss notice and reporting requirements under the Clearwater-NH certificate should not have been dismissed, as issues of fact exist as to whether New Hampshire met those requirements.[11] The requirements are intertwined and exist to ensure that a reinsured apprises the reinsurer of potential liabilities in order to enable the reinsurer to set reserves and to potentially associate in the defense and control of the underlying claims (*see Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.*, 4 F3d 1049, 1065 [2d Cir 1993]). Here, at the very least, issues of fact exist concerning the sufficiency of New Hampshire's reporting and notice. New Hampshire's reliance on a notice of loss it provided to Clearwater in 1997 is misplaced. While the 1997 notice informed Clearwater of the claims against Kaiser, it concluded by advising Clearwater that New Hampshire did not believe that its excess layer, and correspondingly, Clearwater's reinsurance thereof, would be implicated. Discovery should continue to determine what New Hampshire knew of the mounting losses and when it knew, or

---

11. Paragraph 3 (a) of the Clearwater-NH certificate provides: "The Company [New Hampshire] agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify [Clearwater] promptly of any event or development which the Company reasonably believes might result in a claim against [Clearwater]. The Company further agrees to forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by [Clearwater]."

reasonably expected, the losses to penetrate its excess layer of coverage. Although New Hampshire contends that Clearwater knew of the mounting losses through collateral sources, this cannot, as a matter of law, meet New Hampshire's reporting or notice obligations under the Clearwater-NH certificate (*see e.g. Travelers Ins. Co. v Volmar Constr. Co.*, 300 AD2d 40, 43 [1st Dept 2002]).

In the event New Hampshire's notice to Clearwater of the Kaiser losses is determined to have been late, a triable issue also exists as to whether Clearwater was prejudiced by such late notice. Clearwater claims that it was prejudiced because New Hampshire's allegedly late notice resulted in disadvantageous commutation agreements between Clearwater and its own reinsurers, or retrocessionaires (*see Insurance Co. of State of Pa. v Argonaut Ins. Co.*, 2013 WL 4005109, *12 n 13, 2013 US Dist LEXIS 110597, *39 n 13 [SD NY, Aug. 6, 2013, No. 12-Civ-6494 (DLC)]). Since New Hampshire's summary judgment motion was premature, given that it was made when discovery was still "in its infancy" (as Supreme Court noted in discussing the allocation issue), Clearwater's submissions in opposition to the motion sufficiently raised the issue of whether it had been prejudiced by the alleged late notice.

The court also erred in granting New Hampshire summary judgment dismissing Clearwater's seventh affirmative defense, which raised the issue of whether New Hampshire had retained $2 million of risk under the NH-Kaiser policy as required by New Hampshire's retention warranty in the Clearwater-NH certificate.[12] While New Hampshire submitted an affidavit by an administrator asserting in conclusory fashion that New Hampshire had complied with the retention warranty, Clearwater is entitled to test this claim through further discovery. In any event, an issue of fact was raised by evidence Clearwater submitted suggesting that New Hampshire had pooled the retention with other AIG companies.

Accordingly, the order of the Supreme Court, New York County (Ellen M. Coin, J.), entered November 1, 2013, which granted plaintiff's motion for summary judgment to the extent of dismissing defendant's second, third, and seventh affirmative defenses, and otherwise denied the motion, should be mod-

---

**12.** Paragraph 2 of the Clearwater-NH certificate provides: "The Company [New Hampshire] warrants that it shall retain for its own account, subject to treaty reinsurance only, if any, the amount specified on the face of this Certificate [$2 million]."

ified, on the law, to deny the motion insofar as it sought dismissal of the second, third and seventh affirmative defenses, and otherwise affirmed, with costs.

MAZZARELLI, J.P., SAXE and FEINMAN, JJ., concur.

Order, Supreme Court, New York County, entered November 1, 2013, modified, on the law, to deny plaintiff's motion for summary judgment insofar as it sought dismissal of the second, third and seventh affirmative defenses, and otherwise affirmed, with costs.